## COMMONWEALTH *vs.* CHARLES Y. THOMPSON, JR.

Norfolk. April 6, 1998. - July 6, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Search and Seizure,* Automobile, Threshold police inquiry. *Constitutional Law,* Search and seizure, Impartial tribunal. *Identification. Constitutional Law,* Identification. *Habitual Offender. Practice, Criminal,* Waiver of trial by jury, Grand jury proceedings. *Grand Jury.*

In a criminal case, police officers' stop of the defendant was justified by a reasonable suspicion, in the circumstances, of criminal activity. [733-734]

A criminal defendant did not demonstrate that initial one-on-one identifications of him shortly after a robbery were unnecessarily suggestive. [734-736]

In a criminal case in which the defendant was also charged under G. L. c. 278, § 11A, with being a habitual criminal, the trial judge properly exercised her discretion under the statute to hold the jury that returned a guilty verdict on the primary case to try the issue of conviction of prior offenses [736-737], and the defendant's subsequent waiver of his right to a jury trial on that issue was effective [737-738].

In a criminal case, the prosecution's presentation of evidence to the grand jury that described the circumstances in which the defendant was apprehended was neither false nor deceptive, and evidence presented of the defendant's criminal record was relevant to the defendant's indictment as a habitual criminal. [738-739]

INDICTMENTS found and returned in the Superior Court Department on November 10, 1994.

Motions to suppress evidence were heard by *Barbara A. Dortch-Okara,* J., and following trial on the unarmed robbery indictment before *Wendie I. Gershengorn,* J., a jury-waived trial on the habitual criminal indictment was heard by her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Brownlow M. Speer,* Committee for Public Counsel Services, for the defendant.

*Brian A. Wilson,* Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant appeals from convictions of unarmed robbery and of being a habitual criminal. He claims that his unarmed robbery conviction ought to be reversed because the evidence against him was the tainted fruit of an unlawful stop by the police, and the robbery victims' identifications of him violated his due process rights. The defendant also challenges the habitual criminal conviction on the grounds that the judge abused her discretion under G. L. c. 278, § 11A, in refusing to empanel a new jury to try the habitual criminal indictment, and that his ensuing jury waiver was ineffective under G. L. c. 263, § 6, because it was made after the empanelment of the jury. Finally, the defendant argues that his motion to dismiss the indictments should have been allowed because the Commonwealth presented to the grand jury irrelevant and inflammatory evidence regarding his other crimes. We transferred the case to this court on our own motion and now affirm.

## I

At approximately 1 A.M., on October 9, 1994, Dr. Eugene Vaninov was returning home in Brookline with his wife, Ellen, and thirteen year old daughter, Alla. Doctor Vaninov intended to drop off his wife in front of their apartment building, park their vehicle, and walk home with his daughter. As he dropped off his wife, Dr. Vaninov saw a man get out of the passenger side door of a gray motor vehicle and quickly follow Mrs. Vaninov into the apartment building.

Mrs. Vaninov entered the vestibule of the building. The lock on the interior door had been broken for some time and the door could be opened simply by pushing it. She noticed that a man was following her up the stairs to her apartment. She hurried into her apartment and managed to "shut the door right in front of [the man's] face.".

Dr. Vaninov instructed Alla to remain in the vehicle and approached the building. He entered the building approximately forty-five seconds after his wife, and noticed the man who had followed his wife standing in the vestibule. After he went through the interior door into the building, Dr. Vaninov heard that door open behind him and, as he turned around, saw the man approach him quickly. The man immediately struck Dr. Vaninov several times, breaking his glasses and knocking him to the floor. He snatched Dr. Vaninov's wallet, seized his watch, and fled.

After checking his daughter and parking his vehicle, Dr. Vaninov returned to his apartment. Mrs. Vaninov telephoned the police who arrived soon thereafter. Both Dr. and Mrs. Vaninov gave a description of the robber. Their daughter described the motor vehicle the robber entered after the robbery as an older, gray, two-door American model, and the person waiting for the robber in the car as a short black male.

At approximately 1:15 A.M., two Boston municipal housing police officers, Thomas Fay and Timothy Brady, were on patrol in the area of the Mission Hill housing development near Ruggles Street. They noticed a 1985 gray Buick Regal automobile double-parked in a parking area in front of a town-house at 240-260 Ruggles Street. There were two persons inside, and the engine and rear lights were on. The Buick was parked at a right angle to other motor vehicles that were parked facing in to 240-260 Ruggles Street. Both officers were aware that this townhouse was the subject of an ongoing narcotics investigation. They had also previously arrested several individuals in the same area for narcotics offenses.

Officer Fay positioned his cruiser behind the Buick, thus blocking its exit from the parking lot, and approached the driver's side to make a "threshold inquiry." He noticed damage to the left side of the steering column and suspected the motor vehicle to be stolen. Officer Fay gestured to Officer Brady to request a police dispatcher to run a stolen motor vehicle check. When asked, the driver, later identified as Joseph Williams, stated that he was not the owner of the motor vehicle. While waiting for a response from the dispatcher, Officer Brady saw the passenger of the Buick, later identified as the defendant, make several attempts to open his door. On receiving confirmation that the Buick had been stolen in Boston on the previous day, Officer Brady ordered the defendant to leave the vehicle. The defendant jumped out and began to run. Officer Brady promptly pursued him on foot. After placing Williams in custody and putting him into the back seat of the cruiser, Officer Fay drove the cruiser down Albert Street to assist Officer Brady. The defendant was apprehended and also placed into the rear of the cruiser. The two officers then drove back to Ruggles Street, where the Buick had been left parked with its engine running.

Officer Fay observed two handbags on the rear seat of the Buick, and the contents of a handbag and a wallet on the floor of the front passenger seat. These items were later identified as

belonging to several different persons. Officer Fay asked his dispatcher whether there were any reports of handbag snatches in the area. The dispatcher informed him that "Brookline, as well as the [Boston] District 2 Unit, were interested in the motor vehicle and occupants."

Shortly thereafter, two Brookline police cruisers arrived at Ruggles Street with the victims of the earlier robbery. Dr. Vaninov was in the back seat of one cruiser driven by Officer Jeffrey Hutnick. When the defendant was brought to Officer Hutnick's cruiser, Dr. Vaninov identified him as the robber. When Williams was brought over, Dr. Vaninov was unable to identify him. Mrs. Vaninov was in the back seat of the other cruiser driven by Sergeant Michael McCarthy. When the defendant was brought to Sergeant McCarthy's cruiser, Mrs. Vaninov identified him as the robber. She too was unable to identify Williams.

During these identifications, both the defendant and Williams were handcuffed. Flashlights were used to illuminate their faces. The area was also well lit by street lights. The defendant and Williams were placed between six and fifteen feet from the cruisers where the victims were seated.

Dr. Vaninov's wallet was retrieved from the front passenger floor of the stolen Buick. The defendant was wearing Dr. Vaninov's watch. He also had a $5 and a $10 bill in his pants pocket folded separately from his other cash. Dr. Vaninov had earlier reported that a $5 and a $10 bill were the only cash in his wallet. Dr. Vaninov's credit cards were also found in Williams's pockets.

Prior to trial, Williams moved to suppress all evidence as fruit of an illegal seizure violative of the Fourth and Fourteenth Amendments to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. The defendant separately moved to suppress the Vaninovs' identifications of him as having arisen from an identification procedure so unnecessarily suggestive as to violate his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. A combined hearing on both motions was held. The motion judge made written findings of fact and rulings of law on the motions, and denied them. She ruled that the stop by Officers Fay and Brady was justified by a reasonable suspicion based on specific and articulable facts. The judge further ruled that the identification procedure was not unnecessarily suggestive and

was "permissible because it was done efficiently and expeditiously as part of the on-going investigation."

On January 30, 1996, the jury found the defendant guilty on unarmed robbery and assault and battery charges. The Commonwealth then moved for a trial on the habitual offender indictment. The defendant requested that the trial judge empanel a new jury to try this charge. When the judge denied the motion, the defendant waived his right to a trial by jury. The judge found the defendant guilty, and pursuant to G. L. c. 279, § 25, and c. 265, § 19, sentenced him to the maximum term of life imprisonment on the robbery conviction. She placed the assault and battery conviction on file with the defendant's consent.

The defendant appealed, and we transferred the case to this court on our own motion.

## II

### A

The defendant argues that all the evidence against him, including the Vaninovs' out-of-court and in-court identifications of him as the robber, was tainted fruit of an unlawful stop under the Fourth and Fourteenth Amendments and art. 14. His argument fails because the officers' initial stop was justified by a reasonable suspicion of criminal activity.

A stop occurred when Officers Fay and Brady positioned their cruiser behind the Buick, blocking its exit. "[A] person has been 'seized' . . . if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980), quoted in *Commonwealth* v. *Borges*, 395 Mass. 788, 791 (1985). More particularly, an officer initiates a threshold inquiry that must be reasonable within the meaning of the Fourth Amendment and art. 14 when he parks a police cruiser with the intention and effect of blocking a suspect's motor vehicle and preventing it from leaving. See *Commonwealth* v. *Helme*, 399 Mass. 298, 300 (1987); *Commonwealth* v. *King*, 389 Mass. 233, 241 (1983).

We must therefore determine whether the stop was reasonable given the "specific and articulable facts" found by the judge. *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968). A stop is justified if the officers have a "reason to suspect that a person has commit-

ted, is committing, or is about to commit a crime." *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). Although an individual's presence in a high crime area alone will not establish a reasonable suspicion, *Brown* v. *Texas*, 443 U.S. 47, 52 (1979); *Commonwealth* v. *Cheek*, 413 Mass. 492, 496 (1992), it may nevertheless be a factor leading to a proper inference that the individual is engaged in criminal activity. See *Adams* v. *Williams*, 407 U.S. 143, 144-147 (1972); *Commonwealth* v. *Bacon*, 381 Mass. 642, 644 (1980). In *Commonwealth* v. *Almeida*, 373 Mass. 266, 271-272 (1977), this court held that two police officers reasonably initiated a threshold inquiry of a defendant who was sitting in a motor vehicle in a high crime area, late at night, with the engine running and the headlights off, while parked in a private parking area.

The facts of this case are very similar to those of *Almeida*. Officers in both cases approached a parked motor vehicle very late at night. See *id.* at 268. Like the officers in *Almeida, supra*, Officers Fay and Brady knew from personal experience that the motor vehicle was parked in a high crime area. Moreover, they were aware that the townhouse in front of which the motor vehicle was parked was the subject of a narcotics investigation.[1] The motor vehicle here was double-parked and had its engine running. We conclude that Officers Fay and Brady could reasonably infer from the conjunction of these facts that criminal activity might be afoot.

## B

The defendant next contends that the admission at trial of the testimony regarding the Vaninovs' identifications at Ruggles Street, and the subsequent in-court identifications, violated his due process rights under the Fifth and Fourteenth Amendments and art. 12 because the identifications at Ruggles Street resulted from an unnecessarily suggestive procedure. We conclude that

[1]The opinion in *Commonwealth* v. *Almeida*, 373 Mass. 266 (1977), is not clear about when the stop took place: at the time the police officers approached the motor vehicle to make an initial inquiry, or only after they had made that inquiry and the observations that accompanied it. Even if the latter reading is correct, which we doubt, the officers in the instant case had a firmer basis for effecting a stop prior to any inquiry than was present in *Almeida*. The motor vehicle in this case was not parked in a generic "high crime rate area" as in *Almeida, supra* at 268. Rather, it was parked within a parking area in front of a building that was the subject of an ongoing narcotics investigation, in the vicinity of which several narcotics-related arrests had been made.

the police were justified in conducting identifications on Ruggles Street, and that neither those nor subsequent in-court identifications were unnecessarily suggestive.

One-on-one pretrial identifications are generally disfavored because they are viewed as inherently suggestive. *Commonwealth* v. *Johnson*, 420 Mass. 458, 461 (1995); *Commonwealth* v. *Barnett*, 371 Mass. 87, 91-92 (1976), cert. denied, 429 U.S. 1049 (1977). But, as we stated in *Commonwealth* v. *Austin*, 421 Mass. 357, 361 (1995):

> "[A] one-on-one pretrial identification raises no due process concerns unless it is determined to be *unnecessarily* suggestive. Whether an identification procedure is 'unnecessarily' or 'impermissibly' suggestive . . . involves inquiry whether good reason exists for the police to use a one-on-one identification procedure . . . bearing in mind that . . . '[e]xigent or special circumstances are not a prerequisite to such confrontations' " (citations omitted).

Although stating that the analysis cannot be generalized, the *Austin* court went on to observe:

> "Relevant to the good reason examination are the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track."

*Id.* at 362.

The identifications in this case were justified because they constituted parts of an efficient police investigation in the immediate aftermath of a crime. See *Commonwealth* v. *Howell*, 394 Mass. 654, 660 (1985); *Commonwealth* v. *Barnett, supra* at 92. The officers found two handbags and a wallet in the car, suggesting that they were loot from recent robberies. The officers checked whether there had indeed been such robberies, and were informed about the Brookline incident, which had occurred just one hour before. The identification procedure allowed the officers to establish a connection between the stolen goods and the men, and provided Dr. and Mrs. Vaninov a good opportunity to view suspects while their recollections were

fresh. See *Commonwealth* v. *Barnett, supra.* In sum, the defendant failed to carry the burden of showing, by a preponderance of the evidence, that the identifications at Ruggles Street were unnecessarily suggestive. *Commonwealth* v. *Botelho,* 369 Mass. 860, 867 (1976), citing *Commonwealth* v. *Fancy,* 349 Mass. 196, 202 (1965).

Because the initial identifications at Ruggles Street were properly conducted, the subsequent in-court identifications were also proper, and there is no need to determine whether independent sources existed for the in-court identifications. See *Commonwealth* v. *Johnson,* 420 Mass. 458, 463 (1995); *Commonwealth* v. *Botelho, supra* at 866.

## III

The defendant also argues that the judge abused her discretion under G. L. c. 278, § 11A, in refusing his request that a new jury be empanelled to try the habitual criminal indictment. Section 11A specifically states,[2] and the defendant concedes, that the judge has the discretion to hold the jury that has returned the guilty verdict on the crime charged, or to order the empanelling of a new jury to try the issue of conviction of one or more prior offenses. The defendant argues that the "details" of the crime of which the first jury have convicted the defendant may be of significance, and may prejudice him, in a subsequent habitual criminal proceeding. He contends that the jury in this case could not possibly be impartial in the habitual criminal proceeding given that they had found that he had beaten a helpless immigrant doctor and pursued the doctor's wife as she

---

[2]The relevant portion of § 11A states:

"If a defendant is charged with a crime for which more severe punishment is provided for second and subsequent offenses, and the complaint or indictment alleges that the offense charged is a second or subsequent offense . . . [and] [i]f a defendant pleads guilty or if there is a verdict or finding of guilty after trial, then before sentence is imposed, the defendant shall be further inquired of for a plea of guilty or not guilty to that portion of the complaint or indictment alleging that the crime charged is a second or subsequent offense. . . . [I]f [the defendant] pleads not guilty thereto, he shall be entitled to a trial by jury of the issue of conviction of a prior offense, subject to all of the provisions of law governing criminal trials. *A defendant may waive trial by jury. The court may, in its discretion, either hold the jury which returned the verdict of guilty of the crime, the trial of which was just completed, or it may order the impanelling of a new jury to try the issue of conviction of one or more prior offenses.*" (Emphasis added.)

rushed to her apartment. This argument is frivolous. The "details" of the defendant's crime were not in any way unusual. Requiring the empanelling of a new jury in a case of this nature would entail that a new jury is required in virtually every habitual criminal proceeding. That is certainly not what the Legislature intended in enacting § 11A. Nothing in the record indicates that the judge abused the broad discretion given her in § 11A, or that the defendant was otherwise denied a fair and impartial trial.

The defendant additionally argues that the judge's refusal to empanel a new jury rendered his ensuing waiver of trial by jury ineffective. The defendant bases his argument on the text of G. L. c. 263, § 6, the pertinent portion of which states:

> "Any defendant in a criminal case other than a capital case, whether begun by indictment or upon complaint, may, if he shall so elect, when called upon to plead, or later and *before a jury has been impanelled to try him upon such indictment or complaint,* waive his right to trial by jury by signing a written waiver thereof and filing the same with the clerk of the court." (Emphasis added.)

In *Commonwealth* v. *Collado,* 426 Mass. 675, 677 (1998), we ruled that the judge's allowance of the defendant's waiver of his right to trial by jury after empanelment was complete violated § 6.[3] Given that the jury were already empanelled when he chose to waive his right to trial by jury, the defendant argues, his waiver was ineffective. The instant case is distinguishable from *Collado,* in which the defendant waived the right to have a jury determine his guilt. In this case, the defendant waived his right to trial by jury at the beginning of a habitual criminal proceeding that followed a guilt determination. A literal application of § 6 to habitual criminal proceedings would preclude any defendant from waiving his right to trial by jury where the judge decided, within the broad discretion provided by G. L. c. 278, § 11A, to retain the jury that convicted the defendant on the principal charge. Such an application of G. L. c. 263, § 6, would contravene the intent of the Legislature in enacting G. L. c. 278, § 11A, which

---

[3]We, however, went on to hold that, in noncapital cases, an unintentional violation of G. L. c. 263, § 6, will result in a reversal only if the defendant can show a substantial risk of a miscarriage of justice. *Commonwealth* v. *Collado,* 426 Mass. 675, 678 (1998).

unambiguously states that "[a] defendant may waive trial by jury" in a habitual criminal proceeding. Inasmuch as the rule about the timing of the waiver is purely a creature of a statute, we must interpret G. L. c. 263, § 6, in a way that makes it consistent with G. L. c. 278, § 11A: the judge allows the defendant to waive his right to trial by jury when the judge has decided to retain the jury that convicted the defendant on the principal charge. That is what the judge did here, and that was correct.

## IV

Officer Hutnick was the only witness presented by the prosecution to the grand jury. At the prosecutor's request, Officer Hutnick read Officer Fay's report which referred to several wallets and handbags found in the Buick in which the defendant and Williams were seized. For indictment of the defendant as a habitual criminal, the prosecution also had Officer Hutnick recite the defendant's criminal record. The defendant argues that presentation of this evidence impaired the integrity of the grand jury proceeding and thus violated his due process rights under the Fifth and Fourteenth Amendments and art. 12. Therefore, the defendant contends, his motion to dismiss the indictments should have been allowed.

We have in the past expressed our reservations about the prosecution's gratuitous presentation of a defendant's criminal record to a grand jury. See, e.g., *Commonwealth* v. *Koney*, 421 Mass. 295, 305 (1995); *Commonwealth* v. *Freeman*, 407 Mass. 279, 282-283 (1990); *Commonwealth* v. *Champagne*, 399 Mass. 80, 84 (1987). But, as a general rule, a court should not inquire into the quality of evidence heard by a grand jury unless "extraordinary circumstances" obtain, *Commonwealth* v. *Lammi*, 310 Mass. 159, 163-164 (1941), and cases cited, and this is not such an extraordinary case. The disputed evidence regarding the stolen goods found in the Buick in which the defendant and Williams were seized constituted a part of a description of the circumstances in which the defendant was apprehended. And the evidence regarding the defendant's past criminal activities was certainly relevant to the defendant's indictment as a habitual criminal. The information furnished to the grand jury was neither false nor deceptive. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986). "There is nothing to indicate that the prosecutor had purposely sought to

place improper testimony before the grand jury.'' *Commonwealth* v. *Koney, supra.*

There is no reason to set aside the defendant's two convictions.

*Judgments affirmed.*