## Commonwealth *vs.* Seiba Sinforoso.

Essex. January 8, 2001. - June 15, 2001.

Present: Greaney, Ireland, Spina, Cowin, & Sosman, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Automobile, Threshold police inquiry, Arrest. *Practice, Criminal,* Motion to suppress, Required finding. *Arrest. Controlled Substances.*

At a hearing on a motion to suppress evidence in a criminal case, the judge correctly ruled that a State trooper's search of an automobile during an investigatory stop was lawful, where the trooper's conduct of the stop and search was a measured response to an evolving set of facts that, at each step, justified the trooper's concerns for his safety and ultimately his suspicion that there was contraband hidden in a secret compartment in the automobile. [323-324]

In the circumstances of a State trooper's investigatory stop of an automobile, the driver's detention in a police cruiser at the scene of the stop, while the trooper investigated the possibility that the driver was hiding illegal drugs or weapons in a secret compartment of the automobile he was driving, was reasonable, and such detention did not automatically become an "arrest." [325-326]

At the trial of an indictment charging trafficking in cocaine in an amount exceeding 200 grams, there was no error in the judge's denial of the defendant's motion for a required finding of not guilty, where the facts, in combination, showed more than the defendant's mere presence in the vehicle he was driving and permitted the jury to infer that the defendant did indeed have knowledge of and a connection to drugs found in a secret compartment in the automobile. [326-330]

Indictments found and returned in the Superior Court Department on September 20, 1995.

A pretrial motion to suppress evidence was heard by *John C. Cratsley*, J., and the case was tried before *Peter F. Brady*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Gregory I. Massing*, Assistant District Attorney, for the Commonwealth.

*Ronald Ian Segal* for the defendant.

SOSMAN, J. The defendant was convicted of trafficking in cocaine in an amount exceeding 200 grams in violation of G. L. c. 94C, § 32E. The Appeals Court reversed the conviction in an unpublished memorandum and order pursuant to its rule 1:28, concluding there was insufficient evidence to support the defendant's conviction. 49 Mass. App. Ct. 1103 (2000). We granted the Commonwealth's application for further appellate review. We find there was sufficient evidence to convict the defendant of trafficking in cocaine, and also rule that the judge correctly denied the defendant's motion to suppress evidence. We therefore affirm the conviction.

1. *Motion to suppress.* The defendant contends that the motion judge erred in denying his motion to suppress the evidence found during the search of his car. When reviewing the denial of a motion to suppress, "we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Sanna,* 424 Mass. 92, 97 (1997), citing *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990). "The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses . . . ." *Commonwealth* v. *Yesilciman, supra.* The defendant has not shown clear error in any of the motion judge's factual findings, and we will not disturb them.

The motion judge found as follows. On August 12, 1995, Trooper Mark Blanchard of the Massachusetts State police was conducting stationary patrol on Route 129 in Lynn. The posted speed limit on that section of Route 129 was thirty-five miles an hour. At approximately 10:15 A.M., a gray Subaru automobile drove by at a speed of fifty miles per hour, and then failed to stop at a red light. Trooper Blanchard pulled his cruiser out onto Route 129, activated his blue lights, and followed the Subaru. He observed two people in the vehicle. The defendant was the driver. The passenger (later identified as Franklin Melo Pena) looked back at the cruiser several times.

When the Subaru pulled over, Trooper Blanchard approached the driver's side window and asked the defendant for his license and registration. The defendant produced a valid driver's license and registration, which indicated that the car was registered to a Santiago Baez. While the trooper was obtaining the license and

registration, he noticed two large knives and a club on the floor in the front compartment.[1] Both the defendant and Pena looked very nervous. They kept looking at each other, and both were sweating profusely.[2] Trooper Blanchard returned to his cruiser to conduct a license and warrant check on both men. Concerned for his safety after observing the weapons, Trooper Blanchard also radioed for backup.

When another trooper arrived, Trooper Blanchard approached the car again, and ordered the defendant and Pena out of the car. They were both pat frisked for weapons.[3] Trooper Blanchard asked the defendant and Pena where they were coming from and where they were going. They gave conflicting responses to that basic inquiry.

Trooper Blanchard then went to retrieve the weapons. Trooper Blanchard at that time noticed a switch under the driver's side of the dashboard that did not appear to be a factory-installed feature. Based on his training in the use of hidden compartments for concealing drugs or weapons and on a prior arrest he had made involving the use of such a hidden compartment, Trooper Blanchard suspected that the switch on the dashboard might operate a hidden compartment of the Subaru. He then looked around the exterior of the car to see whether there were any other signs of such a compartment, and saw that the gas tank was lowered and affixed with a piece of wood, further suggesting that the car had been altered to create a hidden compartment. Trooper Blanchard asked the defendant "if there

[1]Trooper Blanchard testified that one knife was by the defendant's right leg, and the other knife and wooden club were on the floor by Pena. The size of both knives was in obvious violation of a Lynn ordinance, which prohibited carrying any weapon with a blade in excess of two and one-half inches in length.

[2]Having seen the weapons on the floor of the car, Trooper Blanchard had asked for and obtained identification from Pena as well as from the defendant. While a motor vehicle infraction usually justifies a request for identification of only the operator of the vehicle, not a request for identification of any passengers, see *Commonwealth* v. *Torres*, 424 Mass. 153, 158-159 (1997); *Commonwealth* v. *Alvarez*, 44 Mass. App. Ct. 531, 534 (1998), and cases cited, the inquiry of the passenger was justified by the observation that both the driver and the passenger possessed unlawful weapons. See *Commonwealth* v. *Torres*, 433 Mass. 669, 674 n.5 (2001); *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 663 (1999), *S.C.*, 432 Mass. 613 (2000).

[3]No other weapons were found during the pat frisk. Trooper Blanchard testified that he found a pager on each of the men.

was anything in the vehicle [the troopers] should know about." Both the defendant and Pena responded, "You can check." Trooper Blanchard then placed the defendant and Pena in separate cruisers.

Trooper Blanchard radioed to request the assistance of a narcotics detection canine team. When the canine unit arrived, the dog was taken to the rear of the Subaru. At about that time, Pena climbed out the window of the cruiser and fled on foot. The dog went inside the car and signaled the presence of narcotics in the back of the vehicle. Trooper Blanchard then opened the rear hatch of the car and found that the carpet was not secured in the area above the gas tank. He pulled up the carpet and found a secret compartment. He opened the compartment and retrieved nearly $9,000 in cash and two large, clear bags containing a white powder.[4]

a. *The search of the automobile.* When reviewing the legality of a search conducted during an investigatory stop, we inquire "first, whether the initiation of the investigation by the police was permissible in the circumstances, and second, whether the scope of the search was justified by the circumstances." *Commonwealth* v. *Moses*, 408 Mass. 136, 140 (1990), quoting *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). See *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968). The first prong of this test, the legality of the stop, is not at issue here. This was a permissible traffic stop, and the defendant does not argue otherwise. Cf. *Commonwealth* v. *Santana*, 420 Mass. 205, 207 (1995).

In evaluating whether the police exceeded the permissible scope of a stop, the issue is one of proportion. "The degree of suspicion the police reasonably harbor must be proportional to the level of intrusiveness of the police conduct." *Commonwealth* v. *Williams*, 422 Mass. 111, 116 (1996), citing *Commonwealth* v. *Moses*, *supra* at 141.

Here, the conduct of the officers was proportional to the escalating suspicion that emerged over the course of the stop. During the initial request for license and registration, Trooper Blanchard observed weapons on the floor on both the driver's side and passenger's side of the vehicle. For his own safety, he

---

[4]Later testing of the contents of the bags determined that they contained more than 1,300 grams of cocaine.

requested backup and, once backup arrived, ordered the defendant and Pena out of the car. The defendant and Pena were pat frisked, and Trooper Blanchard then entered the automobile to retrieve the weapons. All of these actions were "reasonable precautions for [Blanchard's] own safety" and thus permissible. *Commonwealth* v. *Moses, supra* at 142.

The defendant argues that once the officers secured the weapons and did not find any other weapons or evidence of illegal drugs, they were prohibited from searching any further. We disagree. When the officer entered the car to remove the weapons, he also saw the nonstandard switch under the dashboard, which, based on his training and experience, indicated that the vehicle might have had a secret compartment of the type often used to transport illegal drugs. Following up on that suspicion, Blanchard then examined the exterior of the car, and noticed in plain view the altered location of the gas tank, which added considerable weight to his suspicion that the vehicle had been modified to create a hidden compartment for carrying contraband. The facts then known to the officer (the weapons, the switch under the dashboard, the lowered gas tank, the nervous demeanor of the occupants, their inconsistent answers to basic questions, and their possession of pagers) were sufficient in combination to justify Blanchard's reasonable suspicion that there might have been illegal drugs or other contraband in a secret compartment in the car.

Based on that reasonable suspicion, the officer called for the canine unit to check the car, a less intrusive alternative to a full search of the vehicle. See *United States* v. *Place*, 462 U.S. 696, 707 (1983) (exposing luggage to trained narcotics detection dogs less intrusive than typical search). Once the dog indicated the presence of narcotics in the rear of the car, the police had probable cause to search the car. See *Commonwealth* v. *Pinto*, 45 Mass. App. Ct. 790, 793 (1998).

The conduct of this stop and search was a measured response to an evolving set of facts that, at each step, justified the officer's concerns for his safety and ultimately his suspicion that there was contraband hidden in a secret compartment in the car. The motion judge correctly ruled that the search of the vehicle was lawful.

b. *The detention of the defendant.* The defendant also alleges that his detention in the police cruiser was an unlawful arrest. According to the defendant, at the time he was placed in the cruiser, the police had not yet discovered any illegal drugs; therefore, they lacked probable cause to arrest him. Consequently, the defendant argues, the items seized after the unlawful arrest should be suppressed. We disagree.

Police are permitted to detain a suspect during an investigatory stop and such detention does not automatically become an "arrest" simply because the defendant is not free to leave. See *Commonwealth* v. *Moses, supra* at 141 (investigative stop "did not change" into arrest where police officers took defendant's keys and defendant was not free to leave); *Commonwealth* v. *Kitchings*, 40 Mass. App. Ct. 591, 596-597 (1996) (placing defendants in cruiser while lone trooper continued investigation was reasonable in circumstances and did not constitute arrest). It is a well "settled principle that '[a] justifiable threshold inquiry permits a limited restraint of the individuals involved as long as their detention is commensurate with the purpose of the stop.' " *Commonwealth* v. *Torres*, 424 Mass. 153, 162 (1997), quoting *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554, 557 (1996).

When evaluating whether a detention during an investigatory stop is of such length that it should be deemed an arrest, it is appropriate to "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States* v. *Sharpe*, 470 U.S. 675, 686 (1985). "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* "What is reasonable within the principle of threshold inquiry must be decided in each case." *Commonwealth* v. *Salerno*, 356 Mass. 642, 646 (1970).

In the present case, the detention of the defendant was reasonable in light of the trooper's growing suspicion that there was contraband in the automobile that the defendant had been driving. As discussed above, the trooper had sufficient reasonable suspicion to continue his investigation. Requesting the assistance of a canine unit was a means "likely to confirm or

dispel [his] suspicions quickly," *United States* v. *Sharpe, supra,* and was, in the circumstances, the least intrusive method of resolving those suspicions. Detaining the defendant to await the arrival of the canine unit, rather than proceeding with a more invasive search of the car, was a reasonable method of pursuing the investigation. There was no evidence that Blanchard's actions "involve[d] any delay unnecessary to the legitimate investigation of the law enforcement officer[ ]." *Id.* at 687.[5] The detention of the defendant while Trooper Blanchard investigated the possibility that the defendant was hiding illegal drugs or weapons in a secret compartment of the car he was driving was permissible in the circumstances.

2. *Motion for required finding of not guilty.* The defendant contends that the trial judge erred in denying his motion for a required finding of not guilty because there was insufficient evidence that he possessed the cocaine found in the secret compartment. When reviewing the denial of a motion for a required finding of not guilty, "[w]e consider the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Cordle,* 412 Mass. 172, 175 (1992). "The relevant question is whether the evidence would permit a jury to find

[5]The detention here, although comparable in duration, is readily distinguishable from the detention at issue in *Commonwealth* v. *Sanderson,* 398 Mass. 761 (1986). In that case, a stop was effected by State troopers based on an anonymous informant's uncorroborated tip concerning the defendant's drug dealing. (Attempts to corroborate the tipster's information had in fact shown that much of the information provided was erroneous. *Id.* at 767.) The stop was made for the purpose of searching the defendant's vehicle, and the show of force used to effect the stop (two cruisers blocking the defendant's vehicle, with three more troopers plus a dog arriving at the scene shortly thereafter, *id.* at 765) was far greater than that at issue here. Unlike *Sanderson,* involving a long period of detention to conduct a search that had been contemplated from the outset, Trooper Blanchard was confronted with an evolving situation, in which a routine traffic stop led to the discovery of weapons, pagers, signs of a secret compartment, nervousness on the part of both occupants, and, ultimately, flight of one of those occupants. Measured responses by the police to gradually escalating suspicious facts that emerge during the course of a routine traffic stop are within the parameters of a reasonable *Terry* stop. A show of significant force, followed by lengthy detention, in order to effect a previously contemplated search based on palpably erroneous information from an anonymous tipster is an unlawful arrest, not a proper *Terry* stop.

guilt, not whether the evidence requires such a finding." *Commonwealth* v. *Brown*, 401 Mass. 745, 747 (1988).

To sustain a conviction of trafficking in cocaine under G. L. c. 94C, § 32E, the Commonwealth must show that the defendant had "possession" of the cocaine. *Commonwealth* v. *Santana*, 420 Mass. 205, 215 (1995). Possession may be actual or constructive. See *Commonwealth* v. *Daley*, 423 Mass. 747, 752 (1996). The defendant contends that the Commonwealth has shown nothing beyond his mere presence in the vehicle where drugs were found. Presence in the same automobile as illegal drugs, "without more, is not sufficient evidence to warrant a finding of possession." *Commonwealth* v. *Garcia*, 409 Mass. 675, 686-687 (1991). "Presence in the same vehicle supplemented by other incriminating evidence, however, may suffice to show knowledge or intent to control," and thus may support a finding that the defendant "possessed" the cocaine. *Id.*

The evidence at trial, viewed in the light most favorable to the Commonwealth, went beyond mere presence and included "other incriminating evidence." *Id.* At trial, the Commonwealth presented the same evidence as that adduced at the hearing on the motion to suppress, plus the following additional details. During the stop, Trooper Blanchard asked the defendant where he lived, to which he responded that he lived and worked in Lynn. When the trooper pointed out to him that his license gave another address, the defendant said that he had failed to notify the Registry of Motor Vehicles of the change. He told the trooper that he worked at a tailor shop in Lynn and that he was on his way to Lawrence at the time he was pulled over. When asked who owned the car, the defendant stated that the car belonged to a "friend," but he could not name the "friend."

After his arrest, the defendant was taken to a State police barracks for booking. Despite having conversed easily in English at the scene of the stop, both the defendant and Pena suddenly claimed that they did not understand English. An officer fluent in Spanish was therefore called to book the defendant, and that officer questioned the defendant further in Spanish. During booking, the defendant gave an address in Brighton as his home address, but did not identify any place of employment. He said that he was going from Boston to Lawrence, and that, while en

route, the two had decided to go to Saugus to buy lobster but had then changed their minds and proceeded toward Lawrence. When questioned about ownership of the car, the defendant became agitated. He said that he did not own the car and he did not know who owned it. A "friend" had lent him the car to go visit some people in Lawrence, but he was again unable to name the "friend."

The defendant used the telephone at the barracks to place a call. The Spanish speaking officer, who was standing nearby, heard the defendant's half of that conversation. The defendant asked to speak with a Bob Brujo, and then told the person on the other end of the line to page Bob Brujo, to tell him that they had been arrested, and to let everyone at AB Fashions (the tailor shop) know that he and his friend had been arrested. The defendant then related, "They will know what to do from there."

The cocaine retrieved from the secret compartment weighed 1,372 grams, was 55% pure, and was estimated to have a street value of $100,000 or a "wholesale" value of $40,000.

At trial, the defendant testified that he did not own an automobile. He had been driven to work at the tailor shop in Lynn that morning by a relative of his boss. Shortly after arriving at work, Pena came to the shop driving the gray Subaru. The defendant thought that the car belonged to Pena. Pena, a friend the defendant had known for many years, asked the defendant to drive him to Lawrence. Pena explained that he was on probation for drunk driving, from which the defendant understood that Pena was not supposed to be driving, and Pena also explained that he felt too tired to drive further. The defendant got permission from his boss to go to Lawrence, and the two left in the Subaru.

Viewed in the light most favorable to the Commonwealth, this evidence adduced more than the defendant's mere presence in a vehicle where cocaine was later found. From the outset of the stop, the defendant and Pena appeared nervous, looking back and forth at each other and at the car. Both were sweating during the encounter. See *Alicea* v. *Commonwealth*, 410 Mass. 384, 387-388 (1991) (defendant's demeanor may support inference that he knew drugs were present). The defendant and Pena

both carried pagers, "an item often associated with the sale of controlled substances." *Commonwealth* v. *Clermy*, 421 Mass. 325, 330 (1995). "Legitimate uses of a beeper are of course common, but an 'item . . . not primarily designed for drug use may take on characteristics of drug paraphernalia by virtue of particular circumstances.' " *Commonwealth* v. *Sanchez*, 40 Mass. App. Ct. 411, 417 (1996), quoting *Commonwealth* v. *Carmenatty*, 37 Mass. App. Ct. 908, 910 (1994). Weapons were on the front floor of the vehicle, including a large knife at the defendant's foot. Being armed in this fashion was consistent with a perceived need to guard the valuable quantity of cocaine and cash in the car.

The defendant gave inconsistent versions concerning where he was going, where he had come from, where he lived, whether and where he worked and, most importantly, implausible versions concerning the car itself. He told the police that the car belonged to a "friend," but he did not know the name of the "friend" who had lent him the car. The jury could certainly infer that no one would lend a car containing in excess of $100,000 in contraband and cash to someone with whom the acquaintance was so slight as not even to know the lender's name.[6]

The defendant's telephone call from the barracks could be interpreted as an alert to others involved that the cocaine shipment had been intercepted by police. He instructed the person on the other end of the telephone to tell "everyone" at the shop about the arrest and declared, "They will know what to do from there." This statement supported the inference that the defendant knew that there was cocaine in the automobile. See *Commonwealth* v. *Garcia*, 409 Mass. 675, 687 (1991) (jury could infer knowledge of drugs from defendant's statement on

---

[6]The evidence presented by the defendant provided yet another explanation about how the defendant came to be driving the car. His claim that Pena had, due to his own license problems, asked the defendant to drive the car for him and take him to Lawrence, is utterly inconsistent with the versions the defendant gave to Trooper Blanchard during the stop and back at the barracks. At no time had he told the police that he thought the car belonged to Pena (a long time friend whose name he knew and who was there beside him in the car), and the defendant's version at trial could not be reconciled with his earlier statements on the same subject.

telephone at police barracks that "I got busted. . . . They got most of it").

In combination, these facts showed more than the defendant's mere presence in the vehicle and permitted the jury to infer that the defendant did indeed have knowledge of and a connection to the drugs in the compartment. Although none of these facts alone would be enough to show the defendant's knowledge of the cocaine in the car, taken together, they "tip the scale in favor of sufficiency." *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 410 (1989), quoting *Commonwealth* v. *Albano*, 373 Mass. 132, 134 (1977). Thus, there was no error in the judge's denial of the defendant's motion for a required finding of not guilty.

*Judgment affirmed.*