NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11989

COMMONWEALTH  vs.  JOSHUA EDWARDS.


Suffolk.     September 6, 2016. - January 20, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.


Constitutional Law, Search and seizure, Investigatory stop,
     Reasonable suspicion.  Search and Seizure, Motor vehicle,
     Threshold police inquiry, Reasonable suspicion.  Threshold
     Police Inquiry.  Firearms.  Alcoholic Liquors, Possession
     of opened bottle.  Beverage Containers.



     Indictments found and returned in the Superior Court
Department on April 23, 2013.

     A pretrial motion to suppress evidence was heard by Kenneth
W. Salinger, J.

     An application for leave to prosecute an interlocutory
appeal was allowed by Botsford, J., in the Supreme Judicial
Court for the county of Suffolk, and the appeal was reported by
her to the Appeals Court.  After review by the Appeals Court,
the Supreme Judicial Court granted leave to obtain further
appellate review.


     Greg L. Johnson for the defendant.
     Matthew T. Sears, Assistant District Attorney, for the
Commonwealth.

BOTSFORD, J.  The defendant, Joshua Edwards, has been indicted for multiple offenses, including firearms offenses, with which he was initially charged following the seizure and search of a motor vehicle he had been driving.  Before trial, he moved to suppress evidence seized during the search of the vehicle, invoking the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.  After an evidentiary hearing, a Superior Court judge allowed the defendant's motion.  A single justice of this court allowed the Commonwealth leave to pursue an interlocutory appeal and reported the case to the Appeals Court.  See Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996).  The Appeals Court reversed in an unpublished memorandum and order issued pursuant to its rule 1:28.  Commonwealth v. Edwards, 87 Mass. App. Ct. 1133 (2015).  We granted the defendant's application for further appellate review.  Recognizing that this is an exceedingly close case, we conclude that the stop was predicated on reasonable suspicion of criminal activity and therefore reverse the motion judge's order allowing the motion to suppress.

Factual background.  One witness, Boston police Officer David Lanteigne, testified at the hearing on the motion to suppress.  In addition, a number of photographs, documents, and

police radio transmissions, as well as a recording of a 911 call, were received in evidence. In reviewing a judge's decision on a motion to suppress, we "accept the judge's subsidiary findings of fact absent clear error, but conduct an independent review of the judge's ultimate findings and conclusions of law." Commonwealth v. Washington, 449 Mass. 476, 480 (2007). Without "detract[ing] from the judge's ultimate findings," Commonwealth v. Jessup, 471 Mass. 121, 127-128 (2015), we supplement his factual findings with "evidence from the record that 'is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony'" (citation omitted). Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).[1]

_____

[1] The judge's factual findings were prefaced with the statement that "[t]he [c]ourt finds that Officer Lanteigne was credible and credits his testimony to the extent it is consistent with and reflected in express findings stated in this memorandum. The [c]ourt does not credit any testimony by Lanteigne that goes beyond or is inconsistent with the court's findings." [2] We have listened to the recording of the 911 call that was admitted in evidence and played during the suppression hearing. Some portions of the recording are inaudible or unclear. We discern no clear error in the subsidiary findings that the judge made with respect to the recording, and therefore accept them. See Commonwealth v. Jewett, 471 Mass. 624, 628 (2015). We make no additional findings with respect to the recording.

On March 17, 2013, at approximately 1:30 A.M., the Boston police received a 911 call.[2]  The caller identified himself by name, Jabari Wattley, and told the operator that he could see a man standing in the street holding a gun.  Wattley further stated that he had seen the man drive off in a black Infiniti motor vehicle, return and park on Armandine Street (in the Dorchester section of Boston), get out of the vehicle holding a gun in his hand, and then get back into the vehicle.[3]  He informed the operator that he knew the man, identified him as the defendant, Joshua Edwards, and said that Edwards was not threatening anyone.

---

[2] We have listened to the recording of the 911 call that was admitted in evidence and played during the suppression hearing. Some portions of the recording are inaudible or unclear.  We discern no clear error in the subsidiary findings that the judge made with respect to the recording, and therefore accept them. See Commonwealth v. Jewett, 471 Mass. 624, 628 (2015).  We make no additional findings with respect to the recording.

[3] The dispatcher's broadcast added, "He's circling the area. He's been driving around."  The motion judge properly predicated his findings on the information provided by the 911 caller rather than the dispatcher's comments.  See Commonwealth v. Lopes, 455 Mass. 147, 155 (2009) (Commonwealth must "establish that the transmitted information bears adequate indicia of reliability").  The judge found that the defendant left and returned; he did not find that the caller reported circling activity, or that any such behavior had occurred.  The transcript from the suppression hearing indicates that, on cross-examination, the police officer agreed that "there's nothing on the 911 recording that was the basis for the information . . . regarding the vehicle circling the area."

The police dispatcher broadcast the information as a "Priority 1" call, requesting "any unit nearby" to respond to the address. A call coded as "Priority 1" "means that it was of a serious nature and that response time and protecting officer safety were both high priorities." A marked cruiser driven by Lanteigne arrived on Armandine Street shortly after the broadcast.[4] The cruiser did not have its emergency lights activated. Lanteigne stopped when a man (later identified as Wattley) ran off his porch toward the cruiser and began "yelling" to Lanteigne and pointing at a black Acura motor vehicle that was parked twenty to thirty feet in front of the cruiser, on the right hand side of the street.[5]

The Acura was legally parked very close to the curb, and was completely dark; no interior or external lights were on. Another vehicle was parked in front of the Acura, but the space or spaces behind it were empty. At that point, Lanteigne observed the Acura's brake lights illuminate, and Wattley yelled something to the effect of, "That's him. That's the guy, he's

---

[4] The motion judge found that Lanteigne knew Armandine Street was in a high crime area; he also knew that repeated incidents of shots fired, gun injuries, homicides and other violent crimes had occurred within a few blocks of the street, but had no information about shots fired or use of a firearm near Armandine Street that night.

[5] The distinction between the Infiniti mentioned by Jabari Wattley on the 911 call and the Acura that he pointed out to Lanteigne is discussed in note 8, infra.

about to drive away."  In response, Lanteigne activated the cruiser's blue lights, strobe lights, and other lights, and moved the cruiser alongside the driver's side of the Acura in order to block the vehicle from leaving.  Lanteigne believed "the Acura was about to drive away . . . [and] understood that the person Wattley had seen with a handgun was driving the Acura."

Lanteigne got out of the cruiser and removed his firearm from its holster.  At the same time, the defendant got out of the Acura and closed the door.  He "appeared to take no notice of and pay no attention to" Lanteigne, and started to walk away. Lanteigne responded by running to the front of his cruiser and ordering the defendant to stop.  When the defendant turned and started walking away quickly, the officer holstered his own weapon, pushed the defendant against the rear of the Acura, forced him to the ground when he resisted being pushed, and handcuffed him.

Another police officer who had responded to the scene stood immediately next to the closed driver's side door of the Acura, and leaned toward the window.  He observed a firearm lying on the floor by the driver's seat.[6]  If the defendant had been

---

[6] A photograph taken through the closed window of the Acura, and showing the firearm on the driver's side floor, was received in evidence.  The judge made no finding as to whether the gun

seated in the vehicle, "his legs would have completely hidden the gun from view."

The police determined that the defendant did not have a Massachusetts driver's license, and that he was not the registered owner of the Acura. The police decided to tow the vehicle because a person having lawful control of the vehicle was not present, and because there had been vandalism in the area. Prior to the tow, the vehicle was searched pursuant to an inventory policy. In addition to the firearm, the police found an open bottle of beer, a cup containing what appeared to be an alcoholic beverage in the console next to the driver's seat, and a closed, full bottle of beer.

Suppression ruling. The motion judge allowed the motion to suppress because he concluded that, at the time Lanteigne stopped and seized the Acura vehicle -- identified by the judge as the moment when Lanteigne activated his cruiser's blue lights and blocked the Acura from leaving -- the police lacked a reasonable, articulable suspicion that criminal activity was afoot.[7] See Commonwealth v. Alvarado, 423 Mass. 266, 268 & n.3 (1996), citing Terry v. Ohio, 392 U.S. 1 (1968). The judge

---

was secured with a safety device. Nothing about the photograph suggests that such a device was present. See G. L. c. 140, § 131L (gun storage statute).

[7] The Commonwealth did not argue that there was probable cause for the stop.

emphasized that it is not unlawful to carry a gun in public; it is only illegal to do so without a license. The judge concluded that a report of a man holding an unholstered gun on a public sidewalk, late at night in a high crime area, was not sufficiently suspicious to warrant an investigatory stop. He therefore ordered that the evidence discovered in the vehicle be suppressed.

Discussion. We agree with the motion judge that the determinative issue in this case is whether the initial stop of the Acura was predicated on "reasonable suspicion, based on specific, articulable facts and reasonable inferences therefrom, that an occupant of the . . . motor vehicle had committed, was committing, or was about to commit a crime." Alvarado, 426 Mass. at 268. See Commonwealth v. Wilson, 441 Mass. 390, 394 (2004). See also Terry, 392 U.S. at 21-22.

Breaking down the inquiry into its component parts, we consider when the stop and seizure occurred, whether the stop was supported by reasonable suspicion, and whether the scope of the ensuing search was proportional to the degree of suspicion that prompted it.

1. Moment of seizure. Like the motion judge, we conclude that the defendant clearly was stopped and seized in the constitutional sense when Lanteigne activated his cruiser's blue lights and blocked the Acura's egress. See Commonwealth v.

Thompson, 427 Mass. 729, 733, cert. denied, 525 U.S. 1008 (1998). Viewed objectively, at that moment, a reasonable person would not have believed that he was free to leave the scene. See Commonwealth v. Barros, 435 Mass. 171, 173-174 (2001); Commonwealth v. Smigliano, 427 Mass. 490, 491 (1998).

2. Reasonable suspicion to initiate stop. Under the principles of Terry, 392 U.S. at 21-22, a police officer may stop a person to make a "threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime." Commonwealth v. Silva, 366 Mass. 402, 405 (1974). An officer's suspicion must be grounded in "'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a 'hunch'" (citation omitted). Commonwealth v. Lyons, 409 Mass. 16, 19 (1990). In this case, the stop was predicated primarily on the information contained in the police broadcast. That information was provided by a person who both identified himself and said he personally had seen the defendant with a gun at 1:30 A.M. on a deserted, residential street. He identified the defendant by name; explained that he knew the defendant; met the police officer, Lanteigne, at the address he had provided to the 911 dispatcher; and pointed out the defendant's vehicle to

Lanteigne.[8]  In these circumstances, Wattley's basis of knowledge was established, and his report of seeing the defendant holding a firearm "could be regarded as reliable without any prior demonstration of his reliability."  Commonwealth v. Gouse, 461 Mass. 787, 793 (2012), quoting Commonwealth v. Bowden, 379 Mass. 472, 477 (1980) (distinguishing reports of anonymous informants from those of "bystanders, victims and participants").

Although Wattley did not describe the firearm to the 911 dispatcher -- and, as the motion judge observed, there is nothing illegal about merely possessing an appropriately licensed gun -- there was more to the 911 call and Wattley's description of the defendant's behavior than mere possession of a gun.[9]  As Wattley reported, the defendant drove away and then came back to Armandine Street; he got out of the vehicle and stood outside while holding a gun -- apparently in his open hand, because Wattley reported seeing the weapon; the defendant

---

[8] Although Wattley, who was calling from the second story of a building, reported to the 911 dispatcher that the vehicle was a black Infiniti, he specifically identified a black Acura to Lanteigne.  In the circumstances -- nighttime, Wattley's location inside his apartment at the time of the 911 call, his location outside and nearer to the vehicle at the time he pointed it out to Lanteigne, and the fact that on both occasions he described the vehicle as black -- the difference is immaterial.

[9] Contrast Commonwealth v. Couture, 407 Mass. 178, 179, 183 cert. denied, 498 U.S. 951 (1990) (report that defendant had been seen inside convenience store with handgun protruding from rear pocket, by itself, was insufficient to support probable cause under Fourth Amendment).

returned the firearm to the vehicle before entering the vehicle himself; and he then sat alone in the vehicle with all of its lights off. These facts, coupled with the time (approximately 1:30 $\underline{A}.\underline{M}$.), the location (a deserted street in a residential area, "within a few blocks" of which there had been repeated crimes of violence, including gun violence and homicides), and the officer's belief that "trained, licensed owners of a handgun typically carry their firearm in a holster,"[10] combine to create a scenario that an experienced police officer could reasonably believe is more consistent with likely criminal activity than it is with lawful possession of a firearm. Although, unlike Commonwealth v. Haskell, 438 Mass. 790, 791, 794 (2003), the defendant was not observed loading the gun, the facts just described concerning the time of night, the location, and the defendant's conduct in driving away and returning and, more particularly, in his handling of the gun as he got out of and then reentered the Acura, were collectively significant.

---

[10] We recognize, as did the motion judge, that a person licensed to carry a gun is not required to carry it holstered and concealed from view. See Couture, 407 Mass. at 181, 183. However, the fact that in the officer's experience, licensed gun owners tend to carry their weapons in holsters, when combined with the other facts discussed in the text, added, albeit marginally, to the facts that collectively amounted to reasonable suspicion. See Commonwealth v. Gomes, 453 Mass. 506, 511 (2009), quoting Commonwealth v. Watson, 430 Mass. 725, 729 (2000) ("Seemingly innocent activities taken together can give rise to reasonable suspicion justifying a threshold inquiry").

When these facts are considered together and in light of Lanteigne's police experience, they are sufficient to establish, even if just barely, the requisite nexus to suspected criminal activity to warrant an investigatory stop, because the officer "could reasonably infer from the conjunction of these facts that criminal activity might be afoot."  Thompson, 427 Mass. at 734. See id. (vehicle double-parked in front of townhouse that was subject of narcotics investigation, late at night, with engine running, in high crime area); Commonwealth v. Almeida, 373 Mass. 266, 271-272 (1977) (reasonable suspicion present where defendant was sitting alone in automobile in high crime area late at night, with its engine running and lights off).[11] Contrast Couture, 407 Mass. at 183 (in absence of other factors, "mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun").

3.  Scope of search.  Not only was the decision to make an investigatory stop objectively reasonable, but the officer's actions were "reasonably related in scope to the circumstances which justified the interference in the first place."

---

[11] "Although an individual's presence in a high crime area alone will not establish a reasonable suspicion, . . . it may nevertheless be a factor leading to a proper inference that the individual is engaged in criminal activity" (citations omitted). Commonwealth v. Thompson, 427 Mass. 729, 734, cert. denied, 525 U.S. 1008 (1998).

Commonwealth v. Borges, 395 Mass. 788, 793 (1985), quoting Terry, 392 U.S. at 20.  See Commonwealth v. Moses, 408 Mass. 136, 141 (1990) (once investigative circumstances for stop are established, "[t]he pertinent inquiry is whether the degree of intrusion is reasonable in the circumstances").  When Lanteigne saw the Acura's brake lights illuminate, he "feared that the Acura was about to drive away."  Activating the cruiser's emergency lights and blocking the Acura's egress were reasonably prudent protective measures that were proportional to the degree of suspicion that prompted the stop.  See Moses, supra ("common knowledge that a person who wants to avoid police questioning, very often will recklessly drive away, resulting in serious injury to the police and bystanders").

The defendant's actions following the initial seizure of the Acura increased the degree of reasonable suspicion, and the police response properly escalated in proportion to it.  See Commonwealth v. Sinforoso, 434 Mass. 320, 323 (2001) ("conduct of the officers was proportional to the escalating suspicion that emerged over the course of the stop").  See also Haskell, 438 Mass. at 794.  At the time of the stop, Lanteigne was alone, very late at night, on a deserted street in an area that he knew from his police experience had been the site of repeated incidents involving the use of guns as well as homicides and other violent crimes.  He was aware of Wattley's report that the

defendant was armed, that he had left the scene and then returned, and that he had held the weapon openly on the residential street before concealing its presence by returning it to the vehicle. Those facts properly were "considered as part of the aggregate circumstances that provide reasonable suspicion to justify a protective frisk." Commonwealth v. Gomes, 453 Mass. 506, 512 (2009). See Wilson, 441 Mass. at 394-395. See also Sinforoso, supra at 325. If the defendant had remained seated in the vehicle, the officer would have been warranted in ordering him from the vehicle to conduct that patfrisk. See Commonwealth v. Robbins, 407 Mass. 147, 151 (1990) (protective measures may include protective frisk and minimal search of interior of vehicle).

The defendant did not, however, remain in the vehicle. Instead, after the cruiser's blue lights and strobe lights had been activated and the cruiser had pulled along the driver's side of the Acura, the defendant get out of the vehicle and "appeared to take no notice of and pay no attention to Lanteigne and started to walk away"; he disregarded the officer's order to stop, and turned and began to walk quickly in a different direction. Because the defendant resisted the officer's attempts to stop him, the officer was warranted in physically restraining him to further the investigation. See Commonwealth v. Williams, 422 Mass. 111, 119 (1996) ("restraint, . . .

limited in duration and necessary to complete the [investigatory] inquiry, does not turn a valid investigatory stop into an unlawful arrest").  See also Commonwealth v. Torres, 424 Mass. 153, 162 (1997) (limited restraint for purposes of threshold inquiry permissible where commensurate with purpose of stop).

While Lanteigne was occupied with the defendant, another officer, who had arrived on the scene and was standing outside the defendant's vehicle, observed a gun on the floor of the Acura near the driver's seat.  For essentially the same reason that Lanteigne was justified in frisking the defendant, and in light of the defendant's actions after the initial stop, the police were entitled to determine "whether the object was, in fact, a weapon which could be used against them.  The [officers] were not required to gamble with their personal safety." Robbins, 407 Mass. at 152.  See Sinforoso, 434 Mass. at 324 (actions of police officers in entering automobile to retrieve discovered weapons was reasonable for officer safety); Silva, 366 Mass. at 408 ("a Terry type of search may extend into the interior of an automobile so long as it is limited in scope to a protective end").  Although the defendant was not in the vehicle at the time the gun was observed, "like the defendant in Silva, [supra,] he was not under arrest at the time of the 'pat-down' search of his person, and there was no assurance that he would

not be returning promptly to his seat behind the wheel of the automobile." Almeida, 373 Mass. at 272. In the circumstances, the police intrusion into the vehicle was reasonably justified in scope.

Once the police lawfully had access to the vehicle, under the plain view doctrine, additional items could be seized, provided the incriminating character was apparent. See, e.g., Commonwealth v. Santana, 420 Mass. 205, 211 (1995). In this case, two open containers of what appeared to be alcoholic beverages were seized from the center console. The incriminating character of these open containers was apparent. See Commonwealth v. Johnson, 461 Mass. 44, 50 n.7 (2011) ("possession of an open container of alcohol in a motor vehicle is a misdemeanor"); G. L. c. 90, § 24I (open container law).[12] We conclude that seizure of the items contained in the vehicle was constitutionally permissible.[13]

---

[12] The Commonwealth did not argue that there was probable cause to search the motor vehicle based on the officer's plain view that the firearm inside the vehicle was neither locked nor secured, in violation of G. L. c. 140, § 131L (gun storage statute). As a result, the judge made no findings with respect to whether the gun was within the defendant's control or, if not, whether there was cause to believe it was not secured with a safety device. We do not, therefore, reach the question whether violation of the gun storage statute would support warrantless entry into the vehicle.

[13] Because we conclude that the firearm and the open containers of alcohol were properly seized, we do not consider

Conclusion.  Considered collectively, the articulable facts in this case combine to establish a reasonable suspicion of criminal activity before the defendant was stopped and seized, albeit with the very narrowest of margins.  Objectively, the police officer could consider the behavior reported, the weapon identified, the time of night, and the characteristics of the location, and reasonably suspect that the sum of these activities equated to criminality.  The order allowing the motion to suppress is vacated, and a new order is to be entered denying the motion.  The case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

---

whether the officers lawfully impounded the vehicle and conducted an inventory search, or whether the search was lawful as a search incident to arrest.