NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1666                                      Appeals Court

COMMONWEALTH  vs.  AUGUSTO DAROSA.

No. 16-P-1666.

Plymouth.      April 12, 2018. - January 8, 2019.

Present:  Green, C.J., Trainor, Rubin, Shin, & McDonough, JJ.[1]


Controlled Substances.  Marijuana.  Constitutional Law, Search
    and seizure.  Search and Seizure, Motor vehicle, Search
    incident to lawful arrest, Probable cause, Reasonable
    suspicion.



Complaint received and sworn to in the Brockton Division of
the District Court Department on September 14, 2012.

    A pretrial motion to suppress evidence was heard by James
M. Sullivan, J., and a motion for reconsideration was also heard
by him; and the case was tried before Antoinette E. McLean
Leoney, J.


    Eric W. Ruben for the defendant.

_____

    [1] This case was initially heard by a panel comprised of
Justices Trainor, Shin, and McDonough.  After circulation of a
majority and a dissenting opinion to the other justices of the
Appeals Court, the panel was expanded to include Chief Justice
Green and Justice Rubin.  See Sciaba Constr. Corp. v. Boston, 35
Mass. App. Ct. 181, 181 n.2 (1993).  Justice Trainor
participated in the deliberation on this case prior to his
retirement.

Johanna S. Black, Assistant District Attorney, for the Commonwealth.

SHIN, J.  The defendant appeals from his conviction of possession with intent to distribute marijuana.[2]  The police recovered the marijuana during a traffic stop, which led to a search of the defendant's vehicle because he did not have a valid driver's license.  With probable cause to arrest for the license violation, two detectives searched the front compartment of the vehicle while the defendant, already pat frisked, sat at the rear of the vehicle, guarded by a third detective.  The motion judge found the search lawful and denied the defendant's motion to suppress on the rationale that, because the detectives had not yet decided whether to arrest the defendant, they were entitled to conduct a "protective sweep prior to allowing [him] to return to his vehicle."  But the evidence did not show, and the Commonwealth did not argue, that the detectives had a reasonable belief that the defendant was armed and dangerous, and the detectives did not decide to arrest him until they

---

[2] The defendant was also charged with possession with intent to distribute a class B substance, carrying a firearm without a license, receiving a firearm with a defaced serial number, possessing a firearm without a firearm identification card, and operating a motor vehicle with a suspended license.  For reasons not reflected in the record, all these charges were dismissed before trial at the Commonwealth's request.

discovered contraband during a more thorough search conducted after the arrival of a K-9 unit.[3]

No recognized exception to the warrant requirement applies in these circumstances. To hold otherwise would confer a police entitlement to search based on probable cause to arrest for any offense, including minor traffic offenses, in contravention of G. L. c. 276, § 1,[4] and the United States Supreme Court decision in Arizona v. Gant, 556 U.S. 332 (2009). Because the items seized from the defendant's vehicle were fruits of the unlawful search, the motion to suppress should have been allowed. We therefore vacate the judgment and set aside the verdict.[5]

Factual background. We summarize the facts as found by the judge and as derived from the detectives' testimony at the suppression hearing, which the judge implicitly credited in

---

[3] The defendant does not independently challenge the legality of the later search or the patfrisk of his person.

[4] "A search conducted incident to an arrest may be made only for the purposes of seizing fruits, instrumentalities, contraband and other evidence of the crime for which the arrest has been made . . . and removing any weapons that the arrestee might use to resist arrest or effect his escape." G. L. c. 276, § 1.

[5] "It appears doubtful that the Commonwealth has enough evidence to reprosecute the defendant[], but we will leave the final decision on that matter to the district attorney . . . ." Commonwealth v. Torres, 424 Mass. 153, 164 (1997). Thus, even though the other issues the defendant raises could occur on retrial, in the exercise of our discretion we decline to address them.

full.  See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007).
Brockton police Detective Brian Donahue was on patrol on Main
Street in Brockton around 10:15 P.M.  He was in an unmarked
vehicle and accompanied by Detective William Carpenter and
Detective Sergeant Frank Vardaro.  Main Street is a heavily
traveled one-way road with two lanes and parking on both sides.
The surrounding area is a commercial district, "densely
populated" with retail businesses, bars, and nightclubs.  It is
also an area "with a high instance of criminal activity"
including "narcotic activity."

As the detectives traveled on Main Street, a minivan in
front of them pulled alongside a Mercedes sport utility vehicle
parked on the side of the road.  The detectives observed an arm
come out of the minivan and hand a plastic grocery bag to
someone in the Mercedes.  The vehicles were stopped in an area
that was heavily trafficked and illuminated by lights from a
nearby court house and businesses.  No person in either vehicle
made an attempt to conceal the transfer of the bag, and none of
the detectives testified that it was consistent with a drug
sale.  In fact, two detectives affirmatively testified that the
transfer did not resonate as suspicious based on their training
and experience.[6]

---

[6] Notably, the Commonwealth does not rely on the transfer in
defending the subsequent search of the defendant's vehicle.

Because the minivan was blocking traffic, Donahue sounded his horn. When the minivan began moving again, the detectives followed it and observed the driver abruptly change lanes without signaling. Donahue then activated the emergency lights on his vehicle and effectuated a traffic stop without incident.

The defendant was the driver and only occupant of the minivan. Upon Donahue's request the defendant could produce a registration but not a license. He told Donahue that he did not have his license with him, but continued to search the headboard and middle console area of the driver's compartment. When Donahue asked what he was looking for, the defendant replied, "[my] license," prompting Donahue to ask, "[W]hy are you looking for it if you already told me you don't have it with you?" The defendant then stopped looking around and complied with Donahue's request to write down his name and date of birth. Leaving the defendant in the minivan, Donahue returned to his vehicle and conducted a computer query, which revealed that the defendant's license was revoked and that he had a criminal record for narcotics violations.[7]

Nothing until this point caused Donahue or the other detectives to perceive the defendant as armed and dangerous. To

---

[7] Although the judge found that the defendant's record "included" narcotics violations, there was no evidence that the defendant had been charged with or convicted of any other type of violation.

the contrary, Donahue agreed that the defendant did not "do anything other than cooperate" during the course of the stop. Likewise, Carpenter agreed that he saw "nothing . . . in [the defendant's] manner, mood, gestures, or anything else" to suggest that he was going to pose a "problem."  Four officers testified in total, and none indicated that the defendant appeared to be armed and dangerous.  Indeed, Donahue acknowledged that he had no evidence that "there would be a weapon in the [minivan]."[8]

Nonetheless, because the defendant did not have a valid license, Donahue ordered him out of the minivan, pat frisked him, and told him to sit on the curb at the rear of the minivan. The defendant remained there, guarded closely by Carpenter, while Donahue and Vardaro searched the front driver and passenger compartments.  During the search Donahue smelled fresh

---

[8] When asked then why he searched the minivan, Donahue replied, "I have that right."  Cf. Gant, 556 U.S. at 337 (officer testified he conducted search "[b]ecause the law says we can do it").  The dissent concludes that Donahue's statement is not comparable to the officer's statement in Gant because Donahue testified that he conducted the search for "[his] safety and the safety of the other officers present."  Post at    . But that testimony was not tied to any particular circumstance concerning this defendant; at no point did Donahue testify that this defendant appeared armed and dangerous or explain what circumstances caused him to form such a belief.  Considering Donahue's testimony as a whole, it is abundantly clear that, similar to the officer in Gant, Donahue believed he had a right to conduct what he deemed a "search incident to arrest" based solely on the existence of probable cause to arrest the defendant for the license violation.

marijuana and saw and smelled fabric softener sheets, which he knew from experience are often used to mask the odor of drugs. Vardaro also discovered a large package of money under the front passenger seat.

Based on these discoveries, Donahue requested that a K-9 unit respond to the scene. The canine, trained to detect drugs, alerted to a bag in the rear compartment of the minivan. Inside the bag was a large amount of marijuana.[9] At this point Donahue placed the defendant under arrest "for the license being revoked."

Judge's decision. The judge issued a three-page memorandum of decision denying the defendant's motion to suppress.[10] The decision begins with a statement of the facts, which is drawn directly from the detectives' testimony. The judge then made the following "[f]indings and [r]ulings" regarding the events that occurred prior to the arrival of the K-9 unit:

> "The initial stop of the defendant's motor vehicle was proper and valid. The defendant's vehicle was double

---

[9] Although not material to our decision, the judge erred in finding that the bag also contained weapons. A weapon was discovered in the minivan, but not until after it had been towed to the police station. There, officers searched the minivan again and found a loaded revolver and Percocet pills secreted in the dashboard.

[10] The Commonwealth did not file a written opposition to the defendant's motion to suppress. Furthermore, although the judge requested at the end of the hearing that both parties incorporate their closing arguments into supplemental written memoranda, the Commonwealth failed to do so.

parked in an active travel lane. It was observed making a transfer to a second vehicle in an area that is known for narcotic activity. Commonwealth v. Thompson, 427 Mass. 729, 735 (1998). Donahue further observed the operator change lanes without signaling and cutting off other motorists in the process. Commonwealth v. Santana, 420 Mass. 205, 207 (1995).

"The scope of the stop is often fluid. The degree of suspicion the police reasonably harbor must be proportional to the level of intrusiveness. Commonwealth v. Sinforoso, 434 Mass. 320 (2001). The defendant's inability to produce a driver's [license] was problematic. The fact that the defendant's right to operate had in fact been revoked caused the situation to rise to the level of ongoing criminal activity. Donahue also became aware of the defendant's criminal history involving narcotics.

"As the defendant was subject to arrest it was proper to detain him away from the vehicle. Thus it was proper to ask the defendant to exit the vehicle and pat frisk him for the safety of the officers present. Commonwealth v. Bostock, 450 Mass. 616, 619-621 (2008). The defendant was informed that his right to operate had been revoked. At that time the officers could have released the defendant and summonsed him to court to answer to the charge at a later date. Accordingly, the defendant could have regain[ed] access to the vehicle. The search of the front [driver] and passenger compartment was an appropriate step for the police as a protective sweep prior to allowing the defendant to return to his vehicle. Commonwealth v. Santiago, 53 Mass. App. Ct. 567, 571 (2002). See also Commonwealth v. Lantigua, 38 Mass. App. Ct. 526, 528 (1995)."

The defendant moved for reconsideration, and the judge held a nonevidentiary hearing. After the hearing, the judge denied the motion based in part on "recent decisional case law" -- namely, Commonwealth v. Wright, 85 Mass. App. Ct. 380 (2014), in which the issue was not the validity of a search, but whether an officer's expansion of the scope of a routine traffic stop, by

calling a K-9 unit, was supported by reasonable suspicion of further criminal activity. Id. at 383-384.

Discussion.[11] Warrantless searches are per se unreasonable under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, "subject only to a few specifically established and well-delineated exceptions." Gant, 556 U.S. at 338, quoting Katz v. United States, 389 U.S. 347, 357 (1967). See Commonwealth v. Craan, 469 Mass. 24, 28 (2014). It is the Commonwealth's burden to show the applicability of one of those exceptions. See Commonwealth v. Perkins, 465 Mass. 600, 603 (2013). Here, the Commonwealth seeks to defend the search on two alternative grounds: (1) by arguing it was a search incident to an arrest; and (2) by asking us to create a new exception for circumstances where, although the officers had probable cause to arrest, they did not do so right away and thus could, theoretically, have allowed the defendant to return to his vehicle.[12] In addition,

---

[11] We review the judge's subsidiary findings of fact for clear error but "review independently the application of constitutional principles to the facts found." Commonwealth v. Wilson, 441 Mass. 390, 393 (2004).

[12] We agree with the Commonwealth's concession at oral argument that it was not inevitable that the minivan would have been impounded and the items in it discovered during an inventory search. At the time of the seizure, the officers had not yet decided to arrest the defendant, nor was it virtually "certain as a practical matter" that the minivan would have been

the dissent concludes that the search was a Terry-type[13] search for weapons.  None of these justifications withstands scrutiny.

1.  Search incident to arrest.  The Commonwealth's primary argument is that the search was permissible as incident to the defendant's arrest for operating a motor vehicle without a license.  This argument faces the threshold problem that, at the time of the search, the defendant was not arrested.  While it is true that a search can qualify as incident to arrest even where it precedes a formal arrest, the search and the arrest still must be "substantially contemporaneous."  Commonwealth v. Washington, 449 Mass. 476, 481 (2007), quoting New York v. Belton, 453 U.S. 454, 465 (1981) (Brennan, J., dissenting).  See Stoner v. California, 376 U.S. 483, 486 (1964).  The contemporaneity requirement is consistent with "[t]he purpose, long established, of a search incident to an arrest," which "is to prevent an individual from destroying or concealing evidence of the crime for which the police have probable cause to arrest, or to prevent an individual from acquiring a weapon to resist arrest or to facilitate an escape."  Commonwealth v. Santiago, 410 Mass. 737, 743 (1991).  See Chimel v. California, 395 U.S. 752, 762-763 (1969).  "To permit a search incident to arrest

_____

impounded even had he been arrested.  Commonwealth v. O'Connor, 406 Mass. 112, 117 (1989).

[13] Terry v. Ohio, 392 U.S. 1 (1968).

where the suspect is not arrested until much later, or is never arrested, would sever this exception completely from its justifications." Washington, 449 Mass. at 482.

Here, the defendant was not arrested until after the K-9 unit arrived, conducted a more thorough search, and discovered the marijuana in the rear of the minivan. The Commonwealth presented no evidence establishing within a reasonable degree of certainty how much time elapsed between the initial search and the arrival of the K-9 unit,[14] or how much additional time elapsed until the discovery of the marijuana.[15] Thus, even accepting the Commonwealth's assertion that the search incident to arrest doctrine allowed the officers to delay their decision to arrest until after seeing the results of the search,[16] the

---

[14] The only evidence on this point was Donahue's testimony that the K-9 unit arrived "within a few minutes."

[15] When asked how long the K-9 unit was at the scene, the K-9 handling officer testified that he "really [did not] know," but that the process "usually [does not] last [as] long" as ten or fifteen minutes. Later, he testified that the canine was in the minivan for "[f]ive minutes maybe" but reiterated that he "really [did not] know."

[16] The assertion is dubious given that the underpinning for the search incident to arrest exception, as applied here, is to search for and remove weapons that the arrestee might use "to resist arrest or effect his escape." Chimel, 395 U.S. at 763. In arguing otherwise, the Commonwealth relies on the statement in Washington that "it is illogical to require [the police] to inflict th[e] greater deprivation of liberty [that results from an arrest] 'to justify the lesser intrusion of a search.'" Washington, 449 Mass. at 486, quoting Commonwealth v. Skea, 18 Mass. App. Ct. 685, 694 (1984). But in Washington the police

Commonwealth did not meet its burden of showing that the search and the arrest were substantially contemporaneous.

Moreover, even assuming contemporaneity, the search was not a lawful search incident to arrest under either Gant or G. L. c. 276, § 1, the latter of which "is more restrictive than the Fourth Amendment." Commonwealth v. Mauricio, 477 Mass. 588, 594 n.2 (2017), quoting Commonwealth v. Blevines, 438 Mass. 604, 607 (2003). Gant holds that the police can search a vehicle incident to an occupant's arrest in only two circumstances: "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" such that he might gain access to a weapon, or "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle'" (citation omitted). Gant, 556 U.S. at 343. The Commonwealth concedes that the officers could not have expected to find evidence of the crime of arrest, i.e., operating without a license, inside the defendant's minivan. See id. at 344; Perkins, 465 Mass. at 605. Thus, to justify the

---

had a basis, apart from incident to arrest, to conduct the warrantless search: there was probable cause to arrest, and the loss of evidence was imminent, creating exigent circumstances. See Washington, supra at 483-487. It was in this context that the court explained that the officers did not have to formally arrest the defendants before searching them. Washington does not stand for the illogical proposition that an officer's decision not to arrest is itself a reason justifying a warrantless search.

search as incident to arrest, the Commonwealth had to show that the defendant was within reaching distance of the passenger compartment of the minivan.

The Commonwealth did not meet this burden either.  The judge did not find that the defendant was in reaching distance, and the evidence would not support such a finding.  As noted supra, the defendant was seated on the curb toward the rear bumper of the minivan, guarded by Carpenter, while Donahue and Vardaro conducted the search.  The defendant was already pat frisked and secured by Carpenter, who stayed "in close proximity" to him during the search.  The detectives could not reasonably have believed in these circumstances that the defendant was within reaching distance of a weapon inside the minivan.  This is supported by Donahue's testimony, which he reiterated several times, that he searched the minivan not because he thought the defendant could reach for a weapon, but because the detectives might have allowed him to get back in the minivan and leave the scene.

The Commonwealth points out that, unlike in Gant, the defendant was not handcuffed or restrained inside a police vehicle.  This is a factual distinction with no legal difference.  Gant itself acknowledges that "officers have many means of ensuring the safe arrest of vehicle occupants," such that "it will be the rare case in which an officer is unable to

fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains." Gant, 556 U.S. at 343 n.4. Here, the defendant was outnumbered three to one and was being guarded closely by one of the detectives. Although the defendant was not handcuffed, he was still secured in a practical sense and not reasonably within reaching distance of any weapons that might have been in the minivan.[17] See Commonwealth v. Cavanaugh, 366 Mass. 277, 280 (1974) (although defendant not handcuffed, it was "at least doubtful that the car was within [his] reach . . . once the [two] officers had him on the sidewalk"). See also United States v. McCraney, 674 F.3d 614, 619-620 (6th Cir. 2012) (although two defendants "were not handcuffed or secured in the back of a patrol car," officers could not reasonably believe they were within reaching distance where "[t]hey were standing . . . behind the [vehicle] as instructed, two or three feet from the rear bumper, with three

---

[17] Contrary to the view taken by the dissent, post at    , we are not engaging in fact finding to reach a conclusion contrary to that of the judge. The judge did not conclude that the search was justified as incident to arrest, and so made no finding whether the defendant was within reaching distance of the minivan. What we reject is the Commonwealth's argument on appeal that, as a matter of law, the defendant was unsecured because he was not handcuffed or restrained inside a police vehicle. In any event, given the dissent's agreement that this was not a valid search incident to arrest, the quarrel with our conclusion that the defendant was secured is of no significance. For purposes of the Terry analysis, as discussed infra, we accept the judge's premise that the officers might have eventually allowed the defendant to return to the minivan.

officers standing around them, while the other two officers on the scene conducted the search").

2. "Search incident to probable cause to arrest." While the Commonwealth strives on appeal to justify the search as one incident to arrest, the judge, as noted, based his ruling on the opposite supposition -- that the defendant might not have been arrested and thus "could have regain[ed] access to the vehicle." The Commonwealth relies on the judge's rationale in the alternative, arguing that the search was justified -- "even were [it] not to fit within the search incident to arrest exception" and even absent "Terry prerequisites" -- because "if [the officers] were to allow the defendant to contact an acquaintance to drive his minivan, the defendant would most likely have returned to his minivan either while they waited or once his acquaintance arrived."

The Commonwealth's position is untenable and would eviscerate the limitations imposed by Gant, which sought to rein in the previously "unbridled discretion" of officers "to rummage at will among a person's private effects" based on the person's commission of an arrestable traffic offense. Gant, 556 U.S. at 345. See Commonwealth v. George, 35 Mass. App. Ct. 551, 555 (1993) ("Given the plenary power that the police have to arrest for traffic offenses, [G. L.] c. 276, § 1, requires us to be on guard for pretext searches not based on a genuine and reasonable

concern about a concealed weapon or destruction of evidence").
The United States Supreme Court acknowledged that its earlier
decision in Belton, 453 U.S. 454, had been widely understood by
lower courts as authorizing a vehicle search "incident to every
arrest of a recent occupant" even where "the vehicle's passenger
compartment will not be within the arrestee's reach at the time
of the search."  Gant, 556 U.S. at 343.  The Court stated, in no
uncertain terms, that to construe Belton so broadly "would serve
no purpose except to provide a police entitlement, and it is
anathema to the Fourth Amendment to permit a warrantless search
on that basis."  Id. at 347.

Upholding the search here on the assumption that the
officers might not have arrested the defendant and might have
let him return to his vehicle would permit an end run around
Gant.  It would be tantamount to conferring an automatic police
entitlement to search a vehicle whenever there is probable cause
to arrest a recent occupant.  But if there is no police
entitlement to search incident to formal arrest, there certainly
can be no entitlement to search incident to probable cause to
arrest.  See Washington, 449 Mass. at 482 (there is no "search
incident to probable cause to arrest" exception to warrant
requirement).

Suggesting otherwise, the Commonwealth claims that officer
safety concerns justified the search because the minivan was

stopped in a high crime area at night.  But as <u>Gant</u> holds, other exceptions to the warrant requirement "ensure that officers may search a vehicle when genuine safety or evidentiary concerns encountered during the arrest of a vehicle's recent occupant justify a search."  <u>Gant</u>, 556 U.S. at 347.  One such exception, established by <u>Michigan</u> v. <u>Long</u>, 463 U.S. 1032, 1049 (1983), authorizes a <u>Terry</u>-type search of the passenger compartment of a vehicle when the officer has reasonable suspicion that a recent occupant is "dangerous" and might access the vehicle to "gain immediate control of weapons."  <u>Lantigua</u> and <u>Santiago</u>, cited in the judge's decision, both concern this exception.[18]  Neither stands for the proposition that an officer is entitled to search a vehicle any time a recent occupant is (or might be) allowed to return to it.  See <u>Gant</u>, 556 U.S. at 352 (Scalia, J., concurring) ("Where no arrest is made," propriety of protective search of vehicle is governed by <u>Long</u>).  Accord <u>McCraney</u>, 674 F.3d at 620.

---

[18] See <u>Santiago</u>, 53 Mass. App. Ct. at 571 (reasonable under <u>Terry</u> for officer to check vehicle for weapons "when the driver and vehicle matched descriptions arising from recent attacks in the area by an individual armed with a dangerous weapon"); <u>Lantigua</u>, 38 Mass. App. Ct. at 528 (officer properly conducted "<u>Terry</u>-type search" based on "particular danger to an officer when the person he is investigating is seated in a car with his movements concealed").  See also <u>Commonwealth</u> v. <u>Silva</u>, 61 Mass. App. Ct. 28, 35 n.8 (2004) (<u>Lantigua</u> "involv[ed] a <u>Terry</u>-type search of a car").

3.  <u>Search based on reasonable suspicion that defendant was armed and dangerous</u>.  This brings us to the ground cited by the dissent -- that the search was a valid <u>Terry</u>-type search for weapons.  For this exception to apply, the Commonwealth had to show that the officers "possess[ed] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer[s] in believing that the [defendant was] dangerous and [could] gain immediate control of weapons."  <u>Long</u>, 463 U.S. at 1049, quoting <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 21 (1968).  See <u>Commonwealth</u> v. <u>Sumerlin</u>, 393 Mass. 127, 129 (1984); <u>Commonwealth</u> v. <u>Silva</u>, 366 Mass. 402, 406, 408 (1974).  In the vehicle context, the Commonwealth must specifically show that there was reasonable suspicion that the vehicle contained a weapon.  See <u>Commonwealth</u> v. <u>Douglas</u>, 472 Mass. 439, 445-446 (2015).

As noted above, the Commonwealth did not argue <u>Terry</u> before the judge.[19]  Perhaps as a result, the judge made no findings on whether a reasonable officer would have been warranted in believing that the defendant was dangerous and could have weapons in his minivan.  Although we can in some situations

---

[19] The Commonwealth's brief cites <u>Terry</u> once -- to argue that the validity of the search "is not dependent on <u>Terry</u> prerequisites."  The words "armed" and "dangerous" do not appear at all in the brief.

affirm on grounds other than those relied on by the judge, we cannot do so where, as here, the findings and the record do not support the alternative ruling. See Mauricio, 477 Mass. at 595. To reach the result that it does, the dissent must find its own facts, which is not an appropriate appellate function. See Commonwealth v. Mayfield, 398 Mass. 615, 625 (1986) (appellate court may not "find facts or . . . draw uncompelled inferences from the evidence").

Specifically, two of the factors relied on by the dissent have no support in the judge's findings or the record. First, the dissent concludes that the defendant's handing of the grocery bag to the person in the Mercedes was an "apparent street-level drug deal." Post at  . But none of the officers so testified, and the judge made no such finding. The transfer was conducted out in the open, in a heavily trafficked and well-lit area,[20] and none of the officers testified that he believed it to be consistent with a drug sale based on his training and experience. In fact, Carpenter affirmatively agreed that, "as a trained detective," the transfer did not appear to him as "anything other than maybe . . . a little odd"; likewise, Vardaro agreed that, although the transfer "perked [his] interest," it "didn't really resonate as anything suspicious

---

[20] Donahue agreed that there was nothing "secret or hidden" about the way that the defendant handed over the bag.

happening at that point."  Thus, our conclusions regarding the transfer are based on the officers' uncontested testimony, which the judge implicitly credited, and are not the result of our own fact finding, as the dissent claims.  And in light of that testimony, this is not a case where the judge could have inferred that the features of the transfer fit the pattern of a typical street-level drug sale.  Cf. Commonwealth v. Kennedy, 426 Mass. 703, 706 (1998) (judge could "supplement with her own inferences the officer's testimony concerning his inferential process in identifying the observed . . . interaction as a drug sale").  We surely cannot draw such an inference ourselves on appeal.

In concluding otherwise, the dissent puts much emphasis on Carpenter's testimony that he found the transfer to be "odd" and on Vardaro's testimony that the transfer "perked [his] interest."[21]  Post at   .  But an officer's belief that a person has done something odd or interesting does not equate to a belief that that person has engaged in a drug transaction. Indeed, Carpenter and Vardaro confirmed that to be the case. And while it is true, as the dissent notes, that drug sales can "occur in a seemingly open and nonsuspicious manner," post at   , there was no testimony to that effect introduced at the

_____

[21] The judge did not mention this testimony in his decision.

hearing.  Contrary to the dissent's view, we cannot rely on notions of "common sense" to overcome not just the complete absence of testimony about the officers' inferential processes, but also affirmative testimony from the officers that, based on their experience and training, the observed transaction did <u>not</u> resonate as a drug sale.  See <u>Kennedy</u>, 426 Mass. at 706 ("Commonwealth should have elicited from the officer more detail on what a typical street-level drug sale looks like from beginning to end").

   Second, the dissent concludes that the defendant made a furtive movement when asked to produce his license.  <u>Post</u> at    .  But the judge did not find that the movement was furtive.  Rather, he simply stated, in the "[f]acts" section of his decision, that "[t]he defendant continued to search the driver's compartment" after telling Donahue that he did not have his license with him, and the judge did not factor the movement into his "[f]indings and [r]ulings."  Ascribing a sinister motive to the movement amounts therefore to appellate fact finding, made all the more improper by the dissent's disregard of the testimony of all three detectives present at the scene that the defendant did not do anything to suggest that he was dangerous.  Donahue observed the defendant's rummaging firsthand and did not react with concern for his safety; he merely asked the defendant what he was doing, asked him to write down his

biographical information, and left him in the minivan while Donahue conducted a computer query. Given Donahue's testimony, the rummaging cannot reasonably be viewed as a furtive gesture suggesting that the defendant was reaching for or hiding a weapon. See Commonwealth v. Daniel, 464 Mass. 746, 752-753 (2013) ("officer's actions in allowing the occupants to move the vehicle without first removing the knife from the dashboard suggest[ed] that the defendants' movements and actions, viewed by a trained officer on the scene, did not create a heightened awareness of danger" [quotations omitted]).[22] At a minimum, it is not an inference that is compelled from the evidence. See Mayfield, 398 Mass. at 625. See also Commonwealth v. Santos, 65 Mass. App. Ct. 122, 125 (2005) ("defendant's movement -- 'sit[ting] up erect from a reclined position . . . and lean[ing] forward' -- add[ed] little to the analysis" where "motion judge did not find the gesture to be furtive, nor did he rely on it in denying the motion to suppress").

The remaining factors cited by the dissent do not establish reasonable suspicion that the defendant was armed and dangerous. The defendant's criminal history did not include any firearms

---

[22] See also Commonwealth v. Hooker, 52 Mass. App. Ct. 683, 687 (2001) ("That the defendant moved his upper shoulders and appeared to place something on the seat is . . . [not] a ground for reasonable apprehension"); Commonwealth v. Holley, 52 Mass. App. Ct. 659, 665 (2001) ("lean[ing] over to the passenger side visor . . . cannot be considered as a threatening gesture").

offenses or other violent offenses.  See Commonwealth v. Gomes, 453 Mass. 506, 512 (2009) (defendant's criminal history, which did not include "any weapons-related offenses," insufficient to create reasonable apprehension of danger).  Even assuming (despite the lack of findings and testimony) that the earlier transfer of the bag, coupled with the defendant's narcotics convictions, could have led the officers to believe he was selling drugs, drug involvement is not sufficient to presume that a defendant is "armed and dangerous for constitutional purposes."  Washington, 449 Mass. at 483.  See Commonwealth v. Dagraca-Teixeira, 471 Mass. 1002, 1004 n.3 (2015); Gomes, 453 Mass. at 511-513; Commonwealth v. Jimenez, 438 Mass. 213, 220 (2002).  Nor would the defendant's traffic offenses give rise to reasonable suspicion.  See George, 35 Mass. App. Ct. at 555. See also McCraney, 674 F.3d at 621.  And although the vehicle was stopped in a high crime area at night, this factor, which must always be viewed "with some caution," Commonwealth v. Holley, 52 Mass. App. Ct. 659, 663 (2001), has less significance here because the officers outnumbered the defendant.  See Gomes, 453 Mass. at 513.

This case is materially indistinguishable from Gomes. There, an officer observed the defendant -- a known "impact player" in the local drug market, id. at 508 -- conduct what the officer believed, based on his training and experience, to be a

drug transaction.  See id. at 511-512.  The transaction occurred around 4 A.M. in an area with a high incidence of crime, including shootings.  See id. at 513.  Nonetheless, the court concluded that the officer lacked reasonable suspicion to conduct a Terry-type patfrisk because he was not alone or outnumbered, and the defendant had no criminal history of weapons-related offenses, made no gestures suggesting that he was carrying a weapon, and did not attempt to flee.  See Gomes, 453 Mass. at 512-513.

The dissent relies heavily on Lantigua, 38 Mass. App. Ct. 526, but reads that case too broadly.  In Santos, 65 Mass. App. Ct. at 127-128, we confined Lantigua to its facts -- the driver there had already gotten out of his vehicle and told the officer that his registration was in the glove compartment.  Lantigua, supra at 527.  On those particular facts, "We held [in Lantigua] that the officer, in the interest of his own safety, could properly retrieve the registration from the place where the defendant said it would be . . . ."  Santos, supra at 127.  But as we stated in Santos, and reiterate here, "Nothing in our Lantigua decision should be read to sanction . . . general rummaging through the interior spaces of a stopped car . . . ."  Id. at 128.

Judgment vacated.

Verdict set aside.

McDONOUGH, J. (dissenting, with whom Trainor, J., joins).
"Under art. 14 of the Massachusetts Declaration of Rights, the
touchstone of our analysis of police conduct that results in a
search or seizure is whether that conduct was reasonable. . . .
The reasonableness of the particular conduct at issue here
involves an evaluation of whether the police exceeded the
permissible scope of the stop, which is an issue of
proportion. . . . Judicial second-guessing of that exercise of
judgment, especially in a rapidly developing situation, is
inappropriate." Commonwealth v. Watts, 74 Mass. App. Ct. 514,
517, 519-520 (2009). Because I believe the majority departs
from these principles, I respectfully dissent. I am satisfied
that the motion judge's conclusion that the limited protective
sweep for weapons of the front seat area of the minivan
unlawfully operated by the defendant was properly ordered as a
"heightened precaution[] for the officers' own safety."
Commonwealth v. Lantigua, 38 Mass. App. Ct. 526, 528 (1995)
("The same concerns that allow an officer investigating a
traffic violation to order the driver out of the car for the
officer's safety . . . also allow a limited search of the
passenger compartment for weapons before the passenger reenters
the car . . .").[1]

--------

[1] I agree with the majority that, as the judge implicitly
concluded, this limited protective sweep for weapons cannot be

Discussion.  The judge found that three experienced Brockton detectives had justification for this limited vehicle protective sweep for weapons where (a) probable cause existed to arrest the defendant for engaging in ongoing criminal activity -- driving with a revoked license; (b) in a high crime area known for narcotics activity, the detectives witnessed the defendant engage in what can reasonably be inferred as an apparent street-level drug deal, and learned that the defendant had a "significant" criminal history that included narcotics convictions and open cases; (c) the defendant moved and answered furtively when asked to produce a driver's license;[2] (d) the defendant, once removed from the minivan but uncuffed and unsecured, could have regained access to the minivan; and (e) to

---

justified as a search incident to an arrest.  The defendant was not arrested until after police conducted a full search of the minivan prompted in part by the results of the sweep. Commonwealth v. Washington, 449 Mass. 476, 481 (2007), quoting New York v. Belton, 453 U.S. 454, 465 (1981) (Brennan, J., dissenting) (proper search incident to arrest may precede arrest, but arrest must be "substantially contemporaneous").

[2] These three circumstances constitute plus factors supporting reasonable suspicion of ongoing criminal conduct. See generally Commonwealth v. DePeiza, 66 Mass. App. Ct. 398, 405 (2006), S.C., 449 Mass. 367 (2007).  While the judge did not use the phrase "plus factors" in his memorandum of decision, he did use it at the hearing on the defendant's motion for reconsideration, emphasizing "that . . . if there had been no plus factors, then it would have been a routine motor vehicle stop, and the defendant should have been allowed to go on his way.  Obviously I found there were some of those plus factors present."

ensure their safety, before allowing the defendant to reenter the minivan, detectives conducted the protective sweep for weapons limited to the front seat area.  I submit that these critical circumstances, explained more fully infra, were established by the judge's findings, supplemented with facts he implicitly credited[3] that are consistent with his decision, and justify the detectives' limited protective sweep.

a.  Defendant's ongoing criminal conduct.  The majority agrees that the detectives were warranted in stopping the defendant for a traffic violation.  See generally Commonwealth v. Buckley, 478 Mass. 861, 865-866 (2018).  After learning that the defendant's license had been revoked -- an arrestable offense -- there existed probable cause that the defendant was engaged in criminal activity, which justified the exit order and the patfrisk of the defendant for officer safety.  Contrast Commonwealth v. Amado, 474 Mass. 147, 152 (2016).

b.  Defendant's narcotics convictions, open cases, and apparent street-level drug deal.  The majority concludes that neither the judge nor the detectives viewed the defendant's bag handoff to an occupant of the Mercedes sport utility vehicle (SUV), through their open windows, at 10 P.M. in a high crime area known for illegal narcotics activity, as an apparent

---

[3] I agree with the majority that "the judge implicitly credited in full" the detectives' testimony.  Ante at    .

street-level drug deal.  Ante at    .  The majority further concludes that "this is not a case where the judge could have inferred that the features of the transfer fit the pattern of a typical street-level drug sale."  Ante at    .  I submit that the majority's conclusions concerning the bag handoff are at odds with the judge's explicit and implicit findings, and with the detectives' testimony.  First, the judge twice discussed the defendant's bag handoff in his findings.  Under the "[f]acts" heading in his memorandum of decision, the judge wrote:

> "This is a densely populated commercial district which hosts retail businesses as well as bars and nightclubs. . . .  It is also an area with a high instance of criminal activity. . . .  As [Detective Donahue, 'an experienced investigator with a background in violent crime and narcotics cases' and Detective Carpenter and Detective Sergeant Vardaro] were traveling northbound [the defendant's minivan], directly in front of them, pulled alongside of a black Mercedes SUV, which was parked on the side of the roadway, and stopped.  The officers observed an arm come out of the [minivan] and hand a large paper bag to an occupant of the Mercedes."

The judge returned to the defendant's bag handoff further on, under his "[f]indings and [r]ulings" heading.

> "[The defendant's vehicle] was observed making a transfer to a second vehicle in an area known for narcotic activity."

Moreover, the judge found that just after the stop the detectives learned of the defendant's "significant criminal history that included narcotics violations," which according to Carpenter's testimony, included "open" narcotics cases.  Thus, I

submit that the majority's conclusion that the bag handoff was not, nor could be, viewed by the judge and the detectives as a likely drug deal fails to pay sufficient deference to the judge's findings.

It is a "well-settled proposition that the judge's findings of fact are 'binding in the absence of clear error . . . and [we] view with particular respect the conclusions of law which are based on them.'" Commonwealth v. Bottari, 395 Mass. 777, 780 (1985), quoting Commonwealth v. Correia, 381 Mass. 65, 76 (1980). Nevertheless, the majority supports its view that neither Carpenter nor Vardaro suspected that the bag handoff was a drug deal because both "testified that the transfer did not resonate as suspicious based on their training and experience." However, the judge made no such finding,[4] and each detective's testimony, read as a whole, reveals that the bag handoff was a focus of the questioning, and in my view confirms that they considered the bag handoff as suggestive of criminal activity. But because the judge credited the testimony, we know that Vardaro resisted defense counsel's insistence that the defendant's bag handoff "didn't mean anything" to him, instead

---

[4] As is discussed more fully infra, a reviewing court may not engage in "independent fact finding" based on the record in order to reach a conclusion of law that is contrary to that of a motion judge. Commonwealth v. Jones-Pannell, 472 Mass. 429, 438 (2015).

stressing in his responses, "I saw it," and saying twice that the bag handoff "would have perked my interest." Defense counsel pressed Vardaro to concede that aside from the traffic violation, "There's not any indication of any other kind of activity going on in this minivan, is there? You don't know anything else except a minivan in front of you stopped for a couple seconds and pulled to the right? . . . That's all you know at this point; right?" But Vardaro held his ground, responding, "No. That's not all we know. [We] know that he stopped. He handed something to somebody on the side of the road, he impeded traffic, and then he took off and changed lanes without signaling until we stopped him. That is what we know at this point."

Again, because the judge credited his testimony, we know that Carpenter, when asked generally what he saw when the defendant's minivan stopped directly behind the Mercedes, singled out the defendant's bag handoff: "We observed the operator of the minivan extend his arm from the driver's door window towards the black Mercedes and pass an item to a passenger in the black Mercedes." On cross-examination, Carpenter rejected defense counsel's premise that the bag handoff was an "innocent gesture" when he was asked, "[T]here was nothing that you noticed about -- or drew your attention for police enforcement reasons of the car in front of you when the

shopping bag -- when the plastic bag was . . . passed from one car to the other; correct?  It . . . just looked like an innocent gesture, didn't it?"  Carpenter, like Vardaro, held his ground, answering, "We -- we found it to be odd. . . .  [It drew] attention that a vehicle is stopped in the middle of the roadway . . . blocking traffic to pass something from one vehicle to another."[5]

While neither the detectives nor the judge used the talismanic words "apparent street-level drug deal" when characterizing the defendant's bag handoff, I submit that in matters of common sense the obvious is often left unspoken.[6] Commonwealth v. Crowe, 21 Mass. App. Ct. 456, 466 (1986) (whether inference is warranted or impermissibly remote is determined not by hard and fast rules of law, but by experience and common sense).  "Absent explicit findings, we analyze[] the record to see if the findings implicit in the judge's ruling are supported" (citation omitted).  Commonwealth v. Grandison, 433

---

[5] So compelling was the inference that the defendant's bag handoff was an apparent drug deal that, on appeal, the defendant argues that it was improper propensity evidence "suggesting that [the defendant] was a drug dealer" and that the erroneous admission created a substantial risk of a miscarriage of justice.

[6] See People vs. Osuna-Avila, Cal. Ct. App., 3rd Dist., No. C064685 (Dec. 29, 2010) ("[A] trial court can rely on an officer's experience and accept the obvious unspoken premise that the [tinted] window looked too dark").

Mass. 135, 137 (2001). "We may affirm the denial of a motion to suppress on any ground supported by the record." Commonwealth v. Washington, 449 Mass. 476, 483 (2007), citing Commonwealth v. Va Meng Joe, 425 Mass. 99, 102 (1997).[7]

I address one final point made by the majority concerning the defendant's bag handoff. In concluding that the judge could not properly infer that the transfer "fit the pattern of a typical street-level drug sale," ante at    , the majority relies on the seemingly innocuous scene and circumstances of the handoff, stressing that "[t]he vehicles were stopped in an area that was heavily trafficked and illuminated by lights from a nearby court house and businesses," and that "[n]o person in either vehicle made an attempt to conceal the transfer of the bag." Ante at    . But the judge's findings do not include any reference to these factors. Here the majority necessarily makes an "independent [finding of fact] in order to reach a conclusion of law that is contrary to that of [the] motion judge" who upheld the protective sweep as lawful. Commonwealth v. Jones-Pannell, 472 Mass. 429, 438 (2015). This, respectfully, it may not do. Id. Moreover, to the contrary, it is well known that

---

[7] Indeed, if the facts found by the judge support an alternative legal theory, a reviewing court is free to rely on an alternative legal theory. See Commonwealth v. Cast, 407 Mass. 891, 897 (1990), citing Commonwealth v. Signorine, 404 Mass. 400, 403 n.1 (1989).

street-level drug sales typically occur in a seemingly open and nonsuspicious manner so as not to attract attention, and to create the impression of normalcy.[8]  "'Seemingly innocent activities taken together can give rise to reasonable suspicion [of drug activity] justifying a threshold inquiry.' Commonwealth v. Watson, 430 Mass. 725, 729 (2000)." Commonwealth v. Gomes, 453 Mass. 506, 511 (2009).[9]

As he did twice in his findings, the judge was entitled to consider the defendant's apparent street-level drug deal as one factor in upholding the limited search of the minivan a "an appropriate step for the police as a protective sweep prior to

---

[8] Indeed, I point out -- for context only -- that the Commonwealth's expert at trial, State police Trooper Erik Telford, testified that dealers typically arrange for drug exchanges in "some public area, parking lots, any street corner, any street, inside bathrooms, fast food stores, restaurants, [and] bars . . . [t]o make it seem as innocuous or benign as just a meet -- as a meet between two people, and unless you're street savvy . . . [you do not know that] it's actually a street level drug transaction . . . .  It's just a safe way to insulate the dealer and the customer to make it look like normal legal activity . . . ."  See Commonwealth v. Singer, 29 Mass. App. Ct. 708, 709 n.1 (1991) (because appeal involves rulings by motion judge prior to trial, "we do not rely on facts developed at trial" but we may "recount some of the evidence at trial . . . merely to give context to the legal issues before us").

[9] That the item here exchanged, a plastic grocery bag, was by itself innocuous does not undercut the suspicious nature of the handoff.  See, e.g., Commonwealth v. Santiago, 470 Mass. 574, 579 (2015) ("Although [the officer] did not see any item actually exchanged, the defendant's extended arm . . . [supported the officer's] belief that a drug transaction between the two men had just taken place").

allowing the defendant to return to his vehicle."  I suggest that the majority's reliance on Washington is misplaced.  There the court held that "[w]hile drug involvement certainly may be a relevant factor in assessment of threats to police safety, we are reluctant to adopt a blanket rule that all persons suspected of drug activity are to be presumed armed and dangerous for constitutional purposes."  Washington, 449 Mass. at 482-483.  Here, rather than applying a "blanket rule," id. at 483, the judge, at most, considered the defendant's criminal narcotics history as just one relevant factor.  Moreover, unlike here, in Washington, "the [motion] judge found specifically that the defendants did nothing to cause the troopers concern for their safety."  Id. at 482.  In contrast, the judge here found otherwise and necessarily credited Donahue's unequivocal testimony that he ordered the limited protective sweep of the front seat area for "[m]y safety and the safety of the other officers present" when the judge found that Donahue and Vardaro "conducted a search for weapons around the driver's and passenger[']s seat[s] in the front of the vehicle."  With that finding, the judge necessarily ruled out any possibility that the detectives conducted the search as a pretext for a search for evidence.  Far from undercutting the judge's rulings, Washington stands for the proposition that these experienced detectives "certainly" could consider the defendant's criminal

history of drug involvement, coupled with his bag handoff in an area known for narcotics activity, as one "relevant factor" in their "assessment of threats to police safety."  Id. at 483.

c.  Defendant's furtive answers and movements.  The majority concludes that the defendant's "rummaging [for his license seconds after telling Donahue he did not have it with him] cannot reasonably be viewed as a furtive gesture suggesting that the defendant was reaching for or hiding a weapon" because "Donahue observed the defendant's rummaging firsthand and did not react with concern for his safety."  Ante at    .  Respectfully, I submit this conclusion cannot be reconciled with the judge's findings.  The judge made no finding -- explicit or implicit -- that Donahue was unconcerned about the defendant's contradictory answers and his unexplained searching movements.  And neither did Donahue so testify.  By detailing in his findings the defendant's contradictory answers and his searching movements prompted by Donahue's questioning, "[i]t may be inferred from the judge's findings," Commonwealth v. Blevines, 54 Mass. App. Ct. 89, 92 n.6 (2002), S.C., 438 Mass. 604 (2003), that the judge viewed Donahue's inquiries as purposeful and prompted by law enforcement objectives.  Specifically, the judge found that after the defendant told Donahue that he did not have his license with him, Donahue saw the defendant continue "to search the driver's compartment," prompting Donahue to ask the

defendant "what he was looking for." When the defendant answered, "[m]y [license]," the judge found that Donahue "reminded him that he had stated he didn't have his [license] with him," at which point the judge found that "[t]he defendant stopped looking around." These findings make clear that the judge found that Donahue's reminder immediately caused the defendant to stop his rummaging. Thus, in my view, the judge implicitly rejected the majority's benign characterization of the defendant's searching movements and his contradictory response when asked why he continued searching the minivan interior.[10] The judge properly included in his calculus the defendant's implicit evasiveness, as well as his readily apparent pretext for continuing to search the front seat compartment in the immediate aftermath of the stop.[11]

    d. <u>The defendant was not secured</u>. Once outside the minivan, the defendant was escorted, without handcuffs, to the rear of the minivan to be with Carpenter. Here, the majority concludes that "[a]lthough [the defendant] was not handcuffed,

---

[10] A suspicious verbal response qualifies as furtive behavior. See, e.g., <u>United States</u> v. <u>Curcio</u>, 694 F.2d 14, 28 (2d Cir. 1982) ("furtive, hangdog, or otherwise suspicious . . . method of answering").

[11] "Although nervous or furtive movements do not supply reasonable suspicion when considered in isolation, they are properly considered together with other details to find reasonable suspicion." <u>Commonwealth</u> v. <u>DePeiza</u>, 449 Mass. 367, 372 (2007).

he was still secured in a practical sense." Ante at    .  I respectfully submit that here the majority is again engaging in "independent fact finding" which undercuts the judge's ultimate conclusion that the sweep was lawful.  Jones-Pannell, 472 Mass. at 438.  The majority's position that the defendant was "secured in the practical sense" is inconsistent with the testimony of the three detectives.  When defense counsel's question to Donahue suggested that the defendant was "outside the car secured," Donahue responded, "He wasn't secured."  When Vardaro was asked, "Was it possible . . . [that the defendant] would have had access to the vehicle again," Vardaro answered, "Yes." And although Carpenter testified that he stayed "in close proximity" to the defendant during "the search of the [front seat area]," when asked if he stood with the defendant "the whole time," Carpenter did not agree, answering, "The majority of the time, I believe."

The judge credited Donahue's concern that the defendant might "regain" access to the minivan because Donahue had not yet decided either to arrest him or "just do a [c]ourt complaint on him for the license [revocation]."  Concerned about the prospect that the defendant might reenter his minivan as a passenger (with a driver he might contact), the judge found that the detectives' check of the front seat area for weapons was "an appropriate step for the police as a protective sweep prior to

allowing the defendant to return to his vehicle."  Donahue's

concern was, as he put it, "anything within the lunge and

reaching area of the —- of the vehicle, of the driver if someone

came to drive the vehicle away or if [the defendant] got into

the passenger seat of the vehicle."  Donahue said that his

interest in doing so was for "[m]y safety and the safety of the

other officers present."[12]  Pressed on the point during cross-

examination, Donahue explained that his concern was "[i]n case

[the defendant] did get back into the vehicle if he was allowed

to leave the scene," adding, "I have that right, sir."   Thus,

---

[12] A police officer does not have to testify specifically that he was in fear for his own safety.  "[T]he officers' concern for their own safety is a fact that can be inferred from all the circumstances:  it does not necessarily depend on direct testimony."  Commonwealth v. Fitzgibbons, 23 Mass. App. Ct. 301, 306 n.5 (1986).

The majority, ante at note 8, compares Donahue's statement -- "I have that right, sir" -- to the officer's testimony in Arizona v. Gant, 556 U.S. 332, 336 (2009), where the defendant claimed, and the United States Supreme Court accepted, that he "posed no threat to the officers after he was handcuffed in the patrol car and because he was arrested for a traffic offense for which no evidence could be found in his vehicle."  When the officer in Gant was asked why he searched the car, he replied, "Because the law says we can do it."  Id. at 337.  But the facts in Gant are distinguishable because here, the defendant was uncuffed and not arrested.  Moreover, Donahue's answer was immediately preceded by:  "I didn't have evidence [of a weapon] but I have the right to check for my safety."  And unlike Gant, Donahue's stated reasons for the protective sweep were "[m]y safety and the safety of the other officers present," which the judge implicitly credited in finding that Donahue and Vardaro "conducted a search for weapons around the driver's and passenger[']s seats in the front of the vehicle."

the record amply supports the judge's finding that the protective sweep was limited in purpose and area to a check for weapons the defendant could access upon reentering the minivan.

e. Lantigua controls. I agree with the judge that in the circumstances, the "Terry-type"[13] protective sweep of the defendant's minivan limited to the driver and the front passenger areas was lawful under the principles of Lantigua, 38 Mass. App. Ct. at 528-529:[14]

> "Inability to produce a license or a registration reasonably gives rise to a suspicion of other offenses, such as automobile theft, and justifies heightened precautions for the officers' own safety.
>
> "Faced with this situation, the officer's entry into the car was justified . . . . First, prior to allowing the defendant to reenter the car to obtain the registration,

---

[13] The majority claims that a Terry-type search was not raised by the Commonwealth. Ante at    . I disagree. In its brief, the Commonwealth cites Terry and Lantigua, the latter of which is an extension of the Terry-type frisk to a protective search of the interior of a vehicle limited to situations where concern remains "that a driver or passenger returning to the vehicle may gain access to a weapon that may be used against the police." Commonwealth v. Douglas, 86 Mass. App. Ct. 404, 411 (2014), S.C., 472 Mass. 439 (2015). And, of course, in upholding the protective sweep, the judge explicitly relied on Lantigua.

[14] See Commonwealth v. Manha, 479 Mass. 44, 49 (2018). "Allowing the defendant to return to the [vehicle] without a search for weapons, where a weapon could be within reach of the defendant, poses an obvious concern for officer safety." Commonwealth v. Galarza, 93 Mass. App. Ct. 740, 744 (2018). See id., quoting Commonwealth v. Edwards, 476 Mass. 341, 348-349 (2017) ("Although the defendant was not in the vehicle at the time the gun was observed, . . . there was no assurance that he would not be returning promptly to his seat behind the wheel of the automobile").

the officers could properly effect a Terry-type search of the areas of the car which would be readily accessible to the defendant on reentering.  The purpose of the search would be protective only, analogous to a pat frisk of the defendant's person for weapons.  The reasonableness of a scan for weapons turns, we think, not so much on the finding that the defendant bent down and to the right before leaving the car, . . . but on the particular danger to an officer when the person he is investigating is seated in a car with his movements concealed from the officer's view.  The same concerns that allow an officer investigating a traffic violation to order the driver out of the car for the officer's safety . . . also allow a limited search of the passenger compartment for weapons before the passenger reenters the car to obtain the registration.  Courts cannot be oblivious to the recent escalation in the numbers of incidents reported wherein police officers have been killed or wounded while performing routine traffic functions.  '[W]e think it crucial to remember that, as shown by many staged climaxes to threshold police inquiries, 'the answer might be a bullet."'  Commonwealth v. Silva, [366 Mass. 402, 407 (1974)], quoting . . . [Terry, 392 U.S. at 33] (Harlan, J., concurring).  In such encounters officers must be allowed to take reasonable precautions for their own safety."

The majority insists that the judge's reliance on Lantigua is misplaced because Lantigua was limited "to its facts" in Commonwealth v. Santos, 65 Mass. App. Ct. 122, 127-128 (2005).  Ante at   .  Because I do not see those or similar words in Santos, nor in any subsequent case discussing either case,[15] I respectfully disagree.  While both cases involved vehicle searches following traffic stops, Santos found Lantigua distinguishable on other material facts.  Santos, supra at 128.

_____

[15] Our holding in Lantigua was recently cited approvingly by the Supreme Judicial Court in Commonwealth v. Sheridan, 470 Mass. 752, 761 (2015).

Reduced to the essence of the facts, in Lantigua, 38 Mass. App. Ct. at 528-529, we upheld a lawful limited protective sweep for weapons, while in Santos, supra at 127, we disapproved of an unlawful unlimited investigatory sweep for evidence.[16]

Eschewing Lantigua, the majority submits that this case is controlled by Gomes, 453 Mass. at 512, ante at      , a case not involving a motor vehicle stop.  There, the court held that the police "lacked particular facts from which a reasonable inference could be drawn that the defendant was armed and presented a danger to the officers or others" that would justify a patfrisk for weapons (yielding "crack" cocaine on his person). Id.  The court so held, even though officers witnessed the defendant engaging in drug activity around 4 A.M. in an area with a high incidence of crime, and was a known "impact player" in the local drug market, with a criminal history involving drug sales, but which did not include "any weapons-related offenses." Id. at 507-508, 512.  Here, the majority concludes:  "This case

---

[16] As in the case before us (but unlike Santos where the defendant was handcuffed in a cruiser), the defendant in Lantigua was neither handcuffed nor secured when the officer entered the vehicle.  Lantigua, 38 Mass. App. Ct. at 527.  We held in Lantigua that the officer, "as a safety precaution," id., "could properly retrieve the registration from the place where the defendant said it would be, rather than have the defendant reenter the protective and partially concealing interior of the car, for the ostensible purpose of retrieving it himself."  Santos, 65 Mass. App. Ct. at 127 (discussing holding in Lantigua).  Thus, as applied to this case, Lantigua remains good law, Santos notwithstanding.

is materially indistinguishable from Gomes." Ante at   .  But plainly it is distinguishable, most materially because while both the defendant and Gomes were engaged in criminal conduct, the defendant before us was engaged in criminal conduct while operating a motor vehicle -- a critical difference compelling a different result.  "The failure of the defendant to produce a license [in this case because it was revoked] is . . . significant.  We have recognized that, in appropriate circumstances, the '[i]nability to produce a license or a registration reasonably gives rise to a suspicion of other offenses, such as automobile theft, and justifies heightened precautions for the officers' own safety.'"  Santos, 65 Mass. App. Ct. at 126, quoting Lantigua, 38 Mass. App. Ct. at 528.

f.  Sweep was cursory check for weapons of front seat area. Our courts have long held that "a Terry type of search may extend into the interior of an automobile so long as it is limited in scope to a protective end."  Silva, 366 Mass. at 408. Such a search must be "confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered. . . .  Thus the search must be confined to the area from which the suspect might gain possession of a weapon."  Commonwealth v. Almeida, 373 Mass. 266, 272 (1977) (allowing sweep of car where defendant "was not under arrest at the time of the 'pat-down' search of his person, and there was

no assurance that he would not be returning promptly to his seat behind the wheel of the automobile").

The majority fears that upholding this limited, cursory protective sweep for weapons would "eviscerate the limitations imposed by Gant, which sought to rein in the previously 'unbridled discretion' of officers 'to rummage at will among a person's private effects' based on the person's commission of an arrestable traffic offense.  Gant, 556 U.S. at 345."  Ante at    .  Respectfully, I suggest that the majority's fears are unfounded.  Nothing of the sort condemned in Gant happened here. In conducting their "cursory search for weapons inside the front compartment" of the minivan, Donahue and Vardaro did not rummage at will through anything.  They did not open a glove box or the center console, nor rummage through seat pockets or anything else, in an effort to search "among a person's private effects." Id.  They made but a quick check under the front seats "looking for weapons" -- nothing more.  The judge characterized the limited sweep as "consistent with the doctrine of proportionality" and as a "measured response to evolving circumstances," and found that the "the intrusions only escalated [commensurate] with the rising level of definable suspicion."

Conclusion.  "It is important to distinguish this case from the cases . . . where the driver of a vehicle stopped for a

traffic violation produces a valid driver's license and registration." Watts, 74 Mass. App. Ct. at 517 n.2. Because I am satisfied that this limited protective sweep for weapons of the minivan's front seat area was properly grounded in reasonable suspicion and that it was necessary to protect the officers' safety, I would affirm the order denying the motion to suppress.